ADAMS, P. J., SPRING, WILLIAMS and HISCOCK, JJ., concurred.

Judgment of conviction affirmed.

---

## Court of Appeals.

### April, 1903.

## THE PEOPLE v. ARTHUR FLANIGAN.

### (174 N. Y. 356.)

1. APPEAL—AMENDMENT OF RECORD.

   The trial judge has power, in a criminal case, on motion made upon notice to the defendant, to amend the record by annexing thereto a copy of an exhibit, received in evidence upon the trial and afterward lost, where there is no doubt as to the substantial accuracy of the

copy, and the judge acts not only upon the affidavits presented but also upon his own recollection.

2. MURDER—HOMICIDE COMMITTED WHILE ATTEMPTING TO ESCAPE FROM PRISON.

Two prisoners, who, while escaping from prison by force, jointly and with a common design assault and strike the keeper so that he dies from the injuries received, are both guilty of murder in the first degree, whether either intended to take life or not, and without regard as to which one struck the mortal blow.

3. SAME—EVIDENCE—CHANGE OF CONDITION OF WEAPONS, ETC., USED.

Where an iron bar and rope used in a homicide committed while escaping from prison were not in the precise condition as when first found through handling by reporters and others, but are substantially the same, their reception presents no error.

4. TRIAL—CHARGE.

Where the court to impress upon the minds of the jury that a man charged with crime is entitled to a fair trial, and that the jury were the exclusive judges of the facts, referred to the trial of the murderer of President McKinley, and stated that " this case should be tried just as fairly as that," it cannot be said that the charge injured the defendant.

5. APPEAL—CHARGE.

A verdict in a homicide case rendered upon conclusive evidence will not be set aside because the trial judge, who had told the jury they were the exclusive judges of the facts, after stating that he understood certain facts were conceded, finally referred to them as actually conceded where the court's attention was not called to the error.

6. INDICTMENT—MURDER—DELIBERATION.

Under an indictment for murder in the first degree a conviction may be had for murder committed while perpetrating a felony, although not specifically pleaded, and in such case deliberation premeditation need not be found. ·

APPEAL from a judgment of the Court of General Sessions of the Peace in the county of New York, rendered September 30, 1901, upon a verdict convicting the defendant of the crime of murder in the first degree, and from an order of said court made March 12, 1903, amending the return on appeal by adding thereto a copy of a lost exhibit received in evidence upon the trial.

The facts, so far as material, are stated in the opinion.

Hugh O. Pentecost, for appellant.

William Travers Jerome, District Attorney (Howard S. Gans, of counsel), for respondent.

VANN, J.: The indictment contains but one count, which, in the common-law form, alleges that the defendant on the 29th of October, 1900, at the borough of Manhattan in the county of New York, " willfully, feloniously and of his malice aforethought, did make an assault " upon one Hugh McGovern with an iron bar, and did therewith inflict a mortal wound upon the said McGovern, of which he died on the same day.

Upon the trial it appeared that on the 17th of October, 1900, the defendant was committed by a magistrate of the city of New York to the custody of the warden and keeper of the city prison upon a charge of burglary. Although confined at first in a cell by himself, owing to the crowded condition of the prison he was soon transferred to the cell of another colored man called Emerson, alias Johnson, who had been committed upon a similar charge. The defendant was a friend of Emerson, and, as one witness testified, had asked to be put in his cell. On the afternoon of Saturday, October 28th, 1900, two steel saws, concealed in a pie, came into the possession of one of these prisoners while they were thus confined together, by means of which two bars of the door of their cell were so nearly severed at either end as to be easily removed, and during the next night, acting in concert, they escaped from the prison. While they were engaged in the effort to escape Hugh McGovern, a night keeper in the prison, was killed by one or both of these men. The defendant fled to the city of Pittsburg, where he was arrested in September, 1901, but the rope made out of bedclothing, which Emerson used in order to reach the ground from a high window, broke under his weight and he was instantly killed.

There is a conflict in the evidence as to what transpired after the two prisoners broke out of their cell into the hall of the prison. A prisoner named Wilson slept in an unlocked cell opening into the same hall. He had been committed at his own request, and was known as a "trusty," which apparently means trustworthy, and, owing to his good behavior as a prisoner, was allowed unusual privileges. He testified that he went to bed about nine o'clock on the night of the homicide, and was awakened by the cry of "Murder! Watch!" He got up at once, hurriedly slipped on his pantaloons and went around the corridor of the prison, where he saw McGovern, who was the keeper of the tier in which the defendant was confined at night, struggling with the defendant and Emerson. He saw both of them strike McGovern, and cried out, "What the hell are you fellows doing?" when they left McGovern and the defendant said: "We will do you up, too, you son of a bitch." Both of the men rushed over to him and each struck him with a club at the same time and knocked him senseless. When he came to there was a blanket over his head.

Another prisoner named Mescall, who slept in an open cell on the tier above the defendant, testified that he heard somebody "hollering very loud, like being in great agony," and rushing in that direction looked down over a railing on the tier beneath, where he saw the defendant and Emerson both strike the witness Wilson. Wilson fell and Mescall heard Emerson say to the defendant, "Stop! stop! that is enough." They struck Wilson "with something with a rag around it." The witness was frightened and ran away.

Early the next morning McGovern was found dead in the hall where Wilson swore he saw him attacked by Emerson and the defendant, with four distinct scalp wounds, two on the top of the head, and two on the back superior curve line. These wounds "were made by blows and not by a fall." The cause of death was "fracture of the skull and cerebral hem-

orrhage." McGovern was lying on his back, his arms were tied closely to his breast with a cot rope and part of a sheet, his feet were tied in a sheet and his head was wrapped in a blanket. Near by him there was a pool of blood " as big as the head of a barrel." The rope was made out of parts of the bed in the cell occupied by the defendant and Emerson, and of another bed in an adjoining cell that was unoccupied that night.

Wilson was found near McGovern, tied hand and foot in the same way, with a rope made out of materials obtained from the same source. He was senseless, and his head, cut and bleeding, was muffled in a blanket.

An iron bar, sawed from the door of the cell occupied by Emerson and the defendant, was lying near the body of McGovern, wrapped in a piece of an old undershirt, which was saturated with blood. Another iron bar was found across an outside window, with a rope, made from parts of the two beds, attached to it and hanging down toward the ground. One of the bars of this window had been sawed and bent until an opening was made large enough for a man to get through. Beneath the end of the rope, which was about 25 feet from the ground, on a pile of iron outside of the prison wall and near to it, Emerson was found, dead. McGovern's watch and money, the keys to the cells which he ordinarily carried and a broken saw were found in Emerson's pocket.

The defendant testified in substance as follows: " This escape was made on Sunday night." The saws were sent in a large pie to Emerson, who showed them to the defendant, but would not let him take them. Emerson began to saw the bars shortly after dark Saturday night and finished about eleven o'clock Sunday night. He then made a rope out of the bed and bed clothing and left it lying in the cell. After the keeper made his rounds at about midnight, Emerson broke off the bars from the cell door, went out in the hall and began to

saw the bars of the outside window. When he finished he came back to the cell where the defendant still was and helped him get out. He then wrapped the two bars, which he had sawed from the door of the cell, in some clothing and used them to pry out the bar he had sawed in the outside window. In the meantime he had asked the defendant if he would escape and his answer at first was, " Yes," then " No," and finally " Yes," if Emerson completed the job so that they could escape without being detected. While the defendant was putting on his shoes outside of the cell and Emerson was prying the window bar, the keeper's gate clicked. Emerson at once jumped down, and, as the defendant continued, " whatever he did then, he must have struck the keeper, for I heard the keeper holler ' Murder, murder, watch ! ' I being in the act of putting on my trousers, threw them on, and putting on my suspenders quickly, ran to the end of the corridor where the occurrence was. I saw the keeper lying there unconscious on the floor. In the meantime this other man, Wilson, came around the corner. . . . I don't know of anything being said by anybody or any vile language being used. The only thing I heard was when I seen this man lying on the floor, I said ' My God.' I didn't strike McGovern. I didn't strike anybody. I told Emerson that I would escape, but I was not willing to be implicated in no murder, or nothing of that kind. . . . After I got around the corner there and saw McGovern lying on the floor and Emerson standing over him the trusty appeared—a man appeared. I didn't hear nobody saying nothing. After that I sat down on the steps which lead from the first tier—this trusty was knocked down. I seen him knocked down, witnessed that myself. I sat right where I paused when I seen this man lying on the floor. . . . I never struck McGovern or the trusty. I sat down to lace my shoes. My shoes was already on. I was nervous. It taken me at least—I might have laced, put on ten pairs of

shoes, the time it taken me to lace those, because I was nervous; my fingers was numb, and everything, from witnessing this sight. When I got up from there I walked over to the cell where I had left my coat and vest lying outside of the cell, put on my vest, then my coat, and then walked over to the window and as I did Emerson appeared from where I don't know. When I left the steps Emerson was leaning over the keeper. Emerson rushed in with his coat half on and half off, only just one sleeve in it, and I said, ' Wait a minute, that sheet will never hold, never in the world,' and he said, ' Yes, it will, it is tight,' and out of the window goes the rope, and I said, ' It will never hold, tie that other end,' just that other end where the spreads are. I says, ' Tie this end,' and I went to tie it and he said, ' No, that will hold,' and he pushed me aside. . . . I stood there to give Emerson time enough to go down to the bottom, as I thought; . . . got hold of the rope and pulled it up. . . . It had broken." He then described his own escape by making a new rope out of materials procured from the unoccupied cell and reaching the ground at a different point from Emerson.

On his cross-examination he testified that Emerson and he had talked about the escape " somewhere round about ten days," but he first made up his mind to escape in the early morning of October 29th. While before that he was opposed to making an escape and knew that Emerson intended to get out, he did not inform the keepers. He did not assist Emerson in making the rope, but did not clearly remember what he was doing himself while the sawing and other preparations were being made. At one time he said that the last he saw clothes, and, when Emerson jumped down from the window with them. He did not assist Emerson in escaping, nor had he ever asked to be transferred to Emerson's cell. When the door clicked Emerson stopped to listen, with the two bars in

his hands. At this time the defendant was putting on his clothes, and, when Emerson jumped down from the window and went forward to the end of the hall, he continued to put on his clothes. Emerson disappeared and the witness stood where he was dressing. When he heard the words "Murder! Watch!" he was still putting on his clothing, and, as he testified, "I did it and finished it and got around there as quickly as I possibly could." He saw McGovern lying unconscious on the floor, but said nothing to Emerson; "I didn't know whether he was striking him then or not," but he had a bar in his hand. The witness had no bar, and while he did not tell Emerson to hit the keeper, he did not try to assist the keeper. "Wilson and I appeared upon the scene about the same time. I didn't say anything at all to Wilson; didn't tell Emerson to hit Wilson. I saw Emerson hit Wilson; saw him have the iron bar in his hand; right hand; didn't holloa to go back and not get struck. . . . I can't tell where that other bar was. . . . After I saw McGovern on the floor and Emerson strike Wilson, I didn't raise any outcry. I said, 'My Lord,' that's all I said. I didn't know how the bodies of McGovern and Wilson were tied up. I don't know whether I stayed there in the corridor or not. . . . I saw blood around there. I saw no blanket over the head of McGovern nor Wilson; that is entirely new to me. I don't know whether or not the body of McGovern was tied and bound hand and foot. I didn't examine McGovern to know whether or not he was killed at that moment; didn't stop to examine him. I told you that he was lying unconscious on the floor, but I don't know whether he was dead or not. I presume Wilson was unconscious too. He was knocked down by Emerson. . . . While he (Emerson) was kneeling over the body of McGovern I was sitting down on the stairs leading to the upper tier tying my shoes, finishing my dress. I hadn't laced

either as yet. At this moment, while I was lacing my shoes, the body also of Wilson was lying there in the corridor."

Shortly afterward, as the defendant testified, the two men went to the window; Emerson got out and the defendant waited long enough for him to get to the bottom, when he discovered that the rope had broken. In order to prepare a new rope, he walked by the bodies of McGovern and Wilson, but didn't see that their heads were covered nor that they were tied.

Two other witnesses were called by the defense, but they testified to nothing relating directly to the merits. The People, in rebuttal, gave evidence tending to show that the pie, in which the saws are supposed to have been concealed, was brought to the prison by a colored girl for the defendant. One of the keepers cut the pie into four pieces, but did not discover the saws.

During the trial the order of commitment, consigning the defendant to the city prison, was received in evidence without objection and marked " Exhibit D." After the case had been settled and printed, it was discovered that this exhibit did not appear in the return made to the Court of Appeals, because it had been lost and the clerk could not annex it to the return as a part of the case as settled. Thereupon the district-attorney made a motion before the trial judge, upon notice to the defendant, to amend the record by annexing thereto a copy of " Exhibit D," and for directions to the clerk to certify the same to the Court of Appeals as part of the return. The motion was founded upon affidavits showing that the exhibit had been lost and after diligent search in the proper places could not be found. A sworn copy was presented, together with affidavits, tending to show that the defendant was brought before one of the city magistrates on the 13th of October, 1900, upon the charge that on the 11th of October, 1900, at the city and

county of New York, while acting in concert with said John-
son or Emerson, he did burglariously break open and enter
premises known as No. 29 West 75th street, occupied as a
dwelling and in which there were three human beings at the
time; that he was committed to the city prison to await
examination, and on the 17th of October, 1900, the magis-
trate, after an examination in due form, decided that the
offense had been committed and that there was probable cause
to believe that the defendant was guilty thereof. Thereupon
the magistrate fixed the bail at the sum of $3,000, and the
defendant, having failed to find a surety for that amount, was
duly committed to the city prison until he should be dis-
charged by due course of law. The commitment for exam-
ination and the commitment to answer each recited that the
charge against the defendant was the crime of burglary and
the said commitments, together with the defendant, were duly
delivered to the keeper of the city prison.

The motion does not appear to have been opposed, and it
resulted in an order amending the return by setting forth a
copy of the commitment and directing the clerk to prepare
an amended and supplemental return and to certify and file
it with the clerk of the Court of Appeals. The defendant
appealed from said order to this court and now insists that
the trial judge had no power to make the amendment and that
he " erred in receiving upon mere affidavits a manufactured
exhibit."

In Peter v. Swan (119 N. Y. 662) we held that " although
a copy of the record has been filed with the clerk, pursuant
to the notice of appeal, yet, the court below so far retains
jurisdiction of the case as to enable it to make such amend-
ments to the record as it shall deem proper and to order that
the amendment shall be duly certified to us and filed with
our clerk." We further declared that " when thus filed, we
regard it as part of the original return and proceed to hear

the case as thus prepared," but we also announced that "if the amendment be of such nature as to show that the record, as amended, was not before the General Term, we should not hear it, as our jurisdiction is confined to a review of the decisions actually made by that tribunal."

As the case now before us did not pass through the Appellate Division, the limitation suggested does not apply, and we regard the case cited as analogous and controlling as to the power of the trial judge to grant the order.

The lost exhibit was of the utmost importance, for a prisoner confined upon a commitment for a felony is guilty of a felony if by force or fraud he escapes from prison, whereas, if the commitment is for a misdemeanor, a prisoner who escapes is guilty of a misdemeanor only. (Penal Code, sec. 85.)

The Code further provides that the killing of a human being, unless it is excusable or justifiable, is murder in the first degree, when committed either from a deliberate or premeditated design to effect the death of the person killed, or without a design to effect death by a person engaged in the commission of, or in an attempt to commit a felony, either upon or affecting the person killed or otherwise. (Sec. 183.)

The case was sent to the jury with instructions permitting them to convict the defendant of murder in the first degree, committed either with deliberation and premeditation, or while engaged in the commission of a felony, and upon the latter theory, which the jury may have adopted, the exhibit was an essential part of the case made by the People upon the trial. The record, before it was amended, showed that the commitment had been received without objection and marked as an exhibit. It was, therefore, a paper which belonged to the record and should have been certified and printed. It was the duty of counsel in preparing a case, and of the trial judge in settling it, to see that so much of the evidence and proceed-

ings upon the trial as were material to the questions to be raised upon the appeal should be made a part of the record, and spread before us, so that we could properly review the trial as it actually took place. (Code Cr. Pro., secs. 458, 459, 485.)

As the loss of the exhibit was duly accounted for, a copy thereof, when conclusively established, was properly made a part of the return. Even if the commitment had been lost before the trial, its contents could have been proved by secondary evidence at the trial. We think the practice adopted below was regular and proper, and that it would be strange, indeed, if the course of justice could be arrested simply because a writing, duly received at the trial and considered by the jury, could not be found, although its contents were established by several witnesses without contradiction. There is no doubt as to the substantial accuracy of the copy which has been made a part of the return. The trial judge recited in his order that he had acted in making it not only upon the affidavits, which were full and satisfactory, but also upon his own recollection, as he lawfully might. We think that the order appealed from should be affirmed.

When the case is considered upon its merits, it is evident from the facts already stated that we should not disturb the verdict, in the absence of exceptions raising error, upon the ground that it was against the weight of evidence or against law, or because justice requires a new trial. (Code Cr. Pro., sec. 528.) If the defendant, as the evidence strongly tended to show, was engaged with Emerson in the act of escaping from prison by force, or in an attempt to so escape, after lawful commitment for a felony, and the two men, acting in concert, whether either intended to take life or not, with a common purpose struck the keeper at the same time, and as the result of the blows thus inflicted he was killed, each was guilty of murder in the first degree. (People v. Sullivan, 173 N. Y.

122; People v. Johnson, 110 N. Y. 134.) Under such circumstances the law does not separate the blows, nor measure their force to see which was mortal, but holds each man liable for the acts of both. The one who aids and abets the common purpose is as guilty as the one who strikes the fatal blow. (Ruloff v. People, 45 N. Y. 213.) He who, without intending to kill, takes human life while engaged in committing a crime, magnifies the homicide in accordance with the gravity of the crime he was committing. (Cox v. People, 80 N. Y. 500, 514; Penal Code, secs. 183, 189.)

Even if the life is taken while the perpetrator is committing a felony, still the other branch of the definition of murder in the first degree may apply, for the intent to kill may exist, and it may be carried into effect with deliberation. (People v. Sullivan, supra.) If the defendant intended to kill, and, acting with deliberation, united with his confederate in striking the blows at the same time for that purpose, he was guilty of murder in the first degree, even if the mortal blow was struck by Emerson, for when the assault is joint and with a common design, each actor is liable for the violence inflicted by both.

Several exceptions relating to evidence were taken by the defendant's counsel during the course of the trial, but the only one argued before us is that the court erred in receiving the iron bar and the rope, which was pulled in from the window on the morning of the homicide, although they were not in the precise condition as when first found. It was shown that the rope had been torn a little by handling during the interval between the homicide and the trial, but that it was the same rope, "the same material," in substantially the same condition as when discovered on the morning of October 29th, 1900. The cloth around the iron bar was "wound tighter" when it was found than it was when the bar was offered in evidence. This also was explained by the handling it had

been through by newspaper reporters and others. All the witnesses who spoke upon the subject testified that it was the same bar and in substantially the same condition. The defendant when on the stand recognized the rope and the bar in evidence as the same rope and the same bar that he saw on the night in question. The exception raised no error.

The only exception taken to the body of the charge was not argued and is of no importance. The defendant's counsel, however, claims that although the questions are raised by no exception, a new trial should be granted on account of the charge under the power intrusted to us by section 528 of the Code of Criminal Procedure. The portions of the charge, now objected to for the first time, when read with the context, are as follows: " You are the sole and exclusive judges of the facts. What are the facts in this case? You are to determine them on your own judgment, and it will be my purpose and my endeavor to do nothing and say nothing which will in any way influence you in that direction. I shall confine myself to the law in the case. I am the supreme judge of the law. And the law, as I lay it down to you, you are to follow implicitly. But the facts you are to determine exclusively without any aid from me. In this case there is no room for prejudice—there should be none—against the defendant, on account of his color, or of any other circumstance. The purpose of our government, and of our courts, has been illustrated but yesterday, in one of the most important criminal cases which has ever been tried in this land. In a case where the Chief Executive of our nation of eighty millions of people was killed deliberately and with premeditation, the defendant has all the forms and safeguards of the law vouchsafed to him and thrown around him. Able lawyers were assigned to defend him, both of them, I believe, ex-judges of a high court of this State; every proper safeguard which could be thrown around a human being was vouchsafed to him. His plea of guilty;

which he wanted to offer to the court, could not be accepted.
The law would not allow him to plead away his life. It
requires that twelve men must listen to the evidence, and only
convict him of the terrible crime with which he was charged,
provided that conviction was justified by the evidence. This
case should be tried just as fairly as that. . . . In no respect
is this case more remarkable, in my judgment, than in its few
contradictions. The most difficult question in this case, it
seems to me, is, did this defendant aid, abet and assist in killing
Hugh McGovern referred to in the indictment?"

After fully defining the various degrees of murder and
manslaughter and carefully pointing out the distinction be-
tween them, the court continued: "The facts which the Peo-
ple claim to have established by the evidence in this case—
and it will be for you gentlemen to determine whether the
evidence sustains their claim or not—are as follows: First,
the People claim that Hugh McGovern, referred to in the
indictment, is dead. That claim, they argue, is established by
the uncontroverted evidence in this case. I understand it to
be conceded that Hugh McGovern, referred to in the indict-
ment, is dead. The next fact which they claim is established
by the evidence is this: That he died in the prison situated in
53rd street in the county of New York on the 29th day of
October, 1900, from injuries inflicted by the defendant and
one Emerson, or, at least, by one of them. The third fact
which they claim is established by the evidence is that, at the
time of inflicting the said injuries, both the defendant and
Emerson were prisoners in the said prison, under a commit-
ment charging them with the commission of a felony. I
understand that this fact is a conceded fact, that they were
both prisoners in this prison in question, in cell No. 6, under
a commitment charging them with the commission of a felony.
I draw your attention to this conceded fact as being applicable
to that section of the statute which makes it murder in the

first degree to kill a person while engaged in the perpetration of a felony. The fourth fact which the People claim is established by the evidence is this: that at the time the injury was inflicted upon the deceased the defendant and Emerson were attempting to commit a felony, namely, to escape from the prison, and that they inflicted the injuries upon McGovern to facilitate and aid their escape. The fifth fact which the People claim is established by the evidence is that the killing of the deceased was without legal justification or excuse. There is no pretense, as I understand the case, that there was any legal justification or excuse for killing McGovern."

Afterward, in summing up part of these claims, the court spoke of them as conceded, as follows: "It is a conceded fact that they were in that prison charged with committing a felony. It is conceded that McGovern came to his death from injuries inflicted by one or both of these men. It is conceded that at the time that these injuries were inflicted they were trying to escape, and finally did escape from that prison."

The charge closed with these words: "You are to determine what the facts are in this case, and, having determined what the facts are, without paying any attention, so far as the questions of fact are concerned, to anything which I may have said, take the law as I have defined it to you and if you find that the facts show that this defendant has made himself liable to the law, and is guilty of murder in the first degree, so find by your verdict. If, on the contrary, you find that, taking into consideration all the facts as you find them, he is guiltless, has committed no crime whatever, say so by your verdict."

The first criticism made in regard to the charge is that the portion relating to the trial of the murderer of President McKinley "could not operate otherwise than injuriously to the defendant's case." We think the charge is not subject to this imputation. The object of the court was to impress upon the minds of the jury that a man charged with crime is

entitled to a fair trial, and to arouse their sense of responsi-
bility by instructing them that they were the exclusive judges
of the facts. As an illustration of the care which the law
takes to protect the rights of every man on trial for his life,
an extreme case was referred to where the prisoner had
attempted to plead guilty, but his plea could not be accepted,
and he was tried with "every proper safeguard which could
be thrown around a human being." Finally the jury were
told that "this case should be tried just as fairly as that."
Whether the remarks were in good taste is not for us to pass
upon, but we think they could not have injured the defend-
ant. Instead of tending to inflame the minds of the jurors
against him, as is claimed, the natural effect was to impress
upon them the duty of fairness toward him, and of deciding
the case only upon the law and the evidence. They could not
have inferred that because Czolgosz was guilty the defendant
was guilty also. ·

The second criticism relating to the charge is that the court
stated certain facts as conceded, whereas the record does not
show that all of them were conceded, although it does show
that they were not disputed, and that they were duly established
by convincing evidence. The attention of the trial judge was
not called to the mistake which it is claimed he made. The
assertion was not challenged and no opportunity was given to
correct it. Whether the defendant's counsel in summing up
had made any concession does not appear. No claim was made
during the trial, and none is made now, that the facts referred
to as conceded were not conclusively established. They were
proved by persuasive and uncontradicted evidence. They were
not denied by the defendant when upon the stand, and indeed
the most, if not all of them, were recognized as true by his
testimony. The trial judge told the jury that they were the
exclusive judges of the facts, and that they were to determine
what the facts were in the case without paying any attention

to what he had said in that regard. After stating that he understood certain facts were conceded, he finally referred to them as actually conceded, but, under the circumstances, we think no harm resulted to the defendant, and that the misstatement should have been pointed out, and, if not corrected, excepted to. In dealing with the facts during an extemporaneous address slight errors are liable to creep into the charge, but it is the duty of counsel to call attention to them and have them corrected. In the absence of an exception we do not think an error of this kind would authorize us to set aside a verdict rendered upon such conclusive evidence as there was in this case. (People v. Hall, 169 N. Y. 184, 198; People v. Constantino, 153 N. Y. 24, 35; Code Cr. Pro., sec. 542.)

The defendant's counsel asked the court to charge, in substance, that the jury could not convict of murder in the first degree unless they found deliberation and premeditation, because homicide committed while perpetrating a felony was not specifically pleaded in the indictment. We have recently held otherwise and the law was well settled before. " Under an indictment for murder in the first degree the prosecution may prove facts to bring the case within any of the provisions of the statute defining the crime." (People v. Sullivan, 173 N. Y. 122, 137, 141; People v. Giblin, 115 N. Y. 196.)

We have endeavored with patience and fairness to review all the questions involved in this case, even if not raised by exceptions or argued by counsel, but we find no just ground upon which a new trial can be granted. The order amending the return and the judgment of conviction should be affirmed.

PARKER, Ch. J., GRAY, O'BRIEN, BARTLETT, HAIGHT and MARTIN, JJ., concur.

Order and judgment affirmed.