THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* CLAUDE UDWIN, JESSE THOMAS and WILLIAM FORCE, Appellants.

256

(Argued June 12, 1930; decided July 8, 1930.)

*Harry A. Gleason* for Claude Udwin, appellant. The evidence is insufficient to sustain a verdict of murder in the first degree. (*People v. Loppy*, 128 N. Y. 629.) The defendant Udwin was not in the act of committing a felony at the time that Sullivan was shot and mortally wounded. (*People v. Huter*, 184 N. Y. 237.)

*Benjamin C. Mead* for Jesse Thomas, appellant. The killing was not committed during an attempt to escape. (*People v. Marwig*, 227 N. Y. 382.)

*Perry E. Leary* for William Force, appellant. The proof does not establish a killing while an attempt to escape was being made. (*People v. Marwig*, 227 N. Y. 382; *People v. Tremaine*, 222 N. Y. Supp. 432.) The evidence as to the defendant Force was entirely circumstantial and as such was insufficient to warrant a conviction. (*People v. Galbo*, 218 N. Y. 283; Underhill on Criminal Evidence [3d ed.], § 17.)

*John H. Sawyer,* District Attorney (*Theodcrc M. Coburn* of counsel), for respondent.

KELLOGG, J.   The conviction was obtained upon an indictment, charging that the defendants, then inmates of Auburn Prison, on December 11, 1929, in concert with other inmates, made an attempt to escape, in violation of section 1695 of the Penal Law, and that, in the course of the attempted escape, they or their confederates killed one Henry Sullivan, whereby the defendants became guilty of the crime of murder in the first degree.

A group of seven inmates, not including these defend-
ants, on the morning of December 11, 1929, instigated
a riot at Auburn Prison. Among them was Henry
Sullivan, for whose death these defendants have been
found responsible. Some of the group, at one point,
held up, captured and disarmed Warden Jennings and
Captain Dempsey; others at a different point, made
Officers Ryther and McTaggart captive. The four officers,
with hands tied behind their backs, were forced, at pistol
point, to mount the stairs leading to the punishment
gallery in the south cell block. As they climbed the
stairs, the convicts behind, members of the rioting
group, called out to the four guards in the gallery: " Stick
them up. We got your Warden, or we will fire." The
guards, observing that the warden and three fellow
officers made a shield for the rioting convicts, threw their
pistols away, surrendered and were made captive. The
eight officers were then locked in one of the gallery cells.
There were fifty-seven convicts locked in an equal number
of cells on this gallery. Among them were these defend-
ants, Udwin, Thomas and Force. The cells were unlocked,
the doors opened, and the inmates told that those who
wanted to go home might come out. Among the many
who emerged were these defendants. Some of the con-
victs remained standing before their cell openings; others
joined the rioting group in its subsequent proceedings.

The original group of rioters, accompanied by eight
to twelve of the freed convicts, after releasing the eight
officers from the cell, marched them down the gallery
stairs, and up into · a hall known as the chapel hall.
Again using the officers as shields, they cried out as they
came: " This is the Warden coming, you will shoot your
Warden." They arrived at a grill work screen which,
stretching from wall to wall, barred their progress.
About twenty or thirty feet further on was the south
wall of a room known as the guard room. A heavy door,

with a small opening through it covered with grill work, closed off the hall from the room. Through this opening a few shots were fired into the hall by officers stationed beyond the door. The firing ceased and conversations were exchanged between the captive guards behind the screen and the officers in the guard room. Finally, Officer McTaggart, crowding through a small opening in the screen, carried a note, written by the warden, to the door of the guard room, and delivered it through the grill to an officer. The note read: "Allow us to go with the prisoners without any fire. The officers are to be used as shields. If a shot is fired the prisoners will kill officers and have sworn to die. Open front gate so the fifteen men can go free. Please don't shoot." The note was signed "E. S. Jennings." No answer came for about an hour. Meanwhile, a door in the screen was opened by a convict and officers and prisoners swarmed through. Handcuffs were discovered in the principal keeper's room. The officers were untied and handcuffed in pairs, making four groups of two handcuffed officers. During all the long wait a convict stood behind each officer pressing a pistol to his spine or the back of his neck. Henry Sullivan stood behind the warden. Needless to say many angry words and numerous threats were uttered. The convicts thought the officers were "stalling." They proposed to "kill one of the 'screws' and paste him up as an example." They shouted to the guard room officers: "Let us out or we will shoot all the guards." It was a tense time. "It seemed an eternity."

Word finally came from the officers in the guard room that they would comply with the request made in the warden's note; that they would provide them with automobiles at the front gate. The door into the guard room was unbarred and a key to unlock it was thrown through the grill. The convicts opened the door, and the men marched through in double file, two handcuffed officers, then two convicts pressing them with pistols, then two

officers, then two convicts, and so on until sixteen had passed, and then seven or more convicts. Warden Jennings and Officer McTaggart entered first. As the last convict passed through, the door into the chapel hall was closed behind them. Except for those who entered, the room was empty. No shots were exchanged. When the entrants had advanced to a point between one-quarter and one-half the length of the room, gas bombs were thrown through the closed grill of the door opening on the right, leading into the front hall, which was in the middle of the right wall. Gas bombs were also thrown down the stairs leading to the warden's kitchen, which was behind and to the right of the entrants. Within a few seconds the room was filled with a black vapor. The handcuffed men and convicts fell to the floor, some of them unconscious, some of them not wholly so. Shots, variously estimated at from six to twenty, were heard in the room.

When the smoke had partly lifted officers with gas masks entered from the front hall. They found the warden, handcuffed to McTaggart, on the floor, and pulled the two into the hall. Other handcuffed officers were found and similarly disposed of. Three of them had been shot in the head but were alive and have since recovered. All the convicts, except Sullivan, had fled through the door into the chapel hall. Subsequently, in that hall, a battle between officers and convicts ensued, in which five of the original group of rioting convicts were killed. That, however, is a story with which we are not now concerned.

The body of Henry Sullivan was found on the floor of the guard room. He was apparently lifeless and was removed to the front hall. A bullet had entered the back of his neck making its exit just below the right eye. While Sullivan was lying on the floor in the hall, certain officers, whose identity has not been established, discharged two bullets into his body. An autopsy was

later performed. It disclosed that the bullet which passed through Sullivan's head had torn the cerebellum; had severed the cartoid artery; had caused half a teacup of clotted blood to accumulate in the cavity of the skull. On the other hand, the bullets discharged into his body had caused mere flesh wounds; they had not penetrated the lung cavity; they left the heart untouched. The physician performing the operation testified that the wound in the head caused Sullivan's death; that death therefrom was inevitable; that the chest wounds did not contribute to his death; that they did not even hasten death. It seems fairly clear, therefore, that Henry Sullivan died from a bullet wound received while he was in the guard room.

Did the bullet which killed Sullivan proceed from a pistol fired by an officer, or by a convict? The evidence upon the subject is wholly circumstantial. The captive officers testified that all the shots fired when they were in the guard room came from within the room; that they came from behind. Many officers, who had been stationed in the hall during the shooting, testified that no shots proceeded from the hall; that all the firing was done within the guard room. This testimony was in accordance with the probabilities. The officers in the hall were aware that the convicts were using the captive guards as shields; that the guards were doubtless in advance of the convicts. Therefore, they knew that a bullet from them might kill a fellow officer. They had previously desisted from firing for this reason; there was no need now to chance it, for soon convicts and guards would be overcome with gas and helpless. Moreover, Sullivan and two of the wounded officers had been shot in the back of the neck, so that the bullets must have come from behind as they were advancing toward the front hall door. Again, the convicts had repeatedly threatened to shoot the captive officers, if they were double-crossed by those in charge. It is highly probable that a convict, in an attempt to kill

the warden, accidentally shot Sullivan who was stationed just behind him.

None of the captive officers, except Hugunin, throughout the riot, had ever carried a gun or other weapon. When Hugunin was dragged into the front hall, after the shooting, he had a pistol in his hand. It was a pistol which had been carried by the defendant Thomas prior to the dropping of the gas bombs. Thomas was standing behind Hugunin. When the gas came Hugunin fell on Thomas. He tells the story thus: " He had a gun in his hand and tried to point it towards me and I reached up and grabbed it and held it to the floor or got it to the floor as quick as I could and he said ' look out or you will shoot yourself, the hammer is back ' and at that time the gun did go off and went through — I could feel the bullet strike my keys and went through my coat and struck these keys." Again he said: " Before the gun went off, Thomas made the remark ' give me that gun you son-of-a-bitch and I will blow your head off ' and I said ' you give me the gun you son-of-a-bitch and I will blow your head off,' and right after that the gun did go off." The palm of Hugunin's hand was cut, apparently by the hammer of the gun as it descended. It thus appears that Thomas still held the gun, probably with his finger on the trigger, since he had been pointing it at Hugunin, when the shot was discharged. If the shot was fired intentionally, certainly the intent did not rest in Hugunin's brain. It cannot be that he willingly fired a pistol so pointed that the bullet struck the keys carried by him. If it was fired accidentally, the accident had its genesis in the wrongful conduct of the defendant Thomas in withholding the pistol from the officer. Assuming that the bullet thus fired killed Sullivan, we would then have a clear case against Thomas, of a killing of a human being " without a design to effect death, by a person engaged in the commission of, or in an attempt to commit a felony, either upon or affecting

the person killed or otherwise," that is to say, of murder in the first degree. (Penal Law, § 1044.) "There may be no intent to kill, but the violence having been perpetrated while engaged in the robbery, burglary or attempt to escape imprisonment, it is murder in the first degree." (*People* v. *Hüter*, 184 N. Y. 237.) If the defendant Thomas was guilty, his fellow conspirators in the attempted escape would equally have been guilty.

By a process of exclusion, therefore, the jury was justified in reasoning to the conclusion that the shot which killed Sullivan was not discharged from an officer's pistol, but from a gun possessed by one of the group of convicts in the guard room. In this respect their finding of guilt was sanctioned by the law of the case as stated by the trial justice: "It is not necessary that the People establish that the shot which killed Sullivan was fired by any of the defendants but it must be established beyond a reasonable doubt that the shot which killed Sullivan was fired by one of the convicts engaged with the defendants, or some of them, in a common purpose or design to unlawfully and feloniously escape."

In *Ruloff* v. *People* (45 N. Y. 213, 217) it was said: "All present at the time of committing an offense are principals, although only one acts, if they are confederates, and engaged in a common design, of which the offence is a part, " and " This general resolution of the confederates need not be proved by direct evidence. It may be inferred from circumstances; by the number, aims and behavior of the parties at or before the scene of action." In *People* v. *Friedman* (205 N. Y. 161, 165) it was said of a request to charge: "The request assumes that if the appellant did not fire the fatal shot he could escape liability unless the conspiracy expressly contemplated the use of such force or violence as might cause death. This is an erroneous view of the law." The court went on to say that there would be liability if a homicide was "the natural and probable result" of the commission of the

lesser felony agreed upon. In *People* v. *Marwig* (227 N. Y. 382, 391) this court quoted with approval a statement from an opinion in *People* v. *Knapp* (26 Mich. 112, at p. 115) as follows: " In other words, the principle is quite analogous to that of agency, where the liability is measured by the express or implied authority." In this instance a group of convicts planned to escape from State's prison, to attempt which by overt acts constitutes a felony. (Penal Law, § 1695.) In furtherance of their design they captured and disarmed officers; armed themselves with pistols; marched the officers before them with pistols pressed against their bodies; threatened to shoot the guards on duty; announced their purpose to be that, in case of resistance to their efforts, they would kill every officer held hostage. Thus the commission of homicides, if their escape would thereby be aided, or if their efforts were resisted or frustrated, was made part and parcel of their original plan of breaking prison. The plan miscarried only in this, that, when their escape was resisted, the killing of a fellow conspirator, rather than a captive officer, resulted from a misdirected bullet discharged from a pistol held by one of them. That homicide, the jury might well have found, was the natural and probable consequence of the acts of escape originally planned, and, therefore, all the conspirators were liable therefor. *People* v. *Marwig* (*supra*) holds nothing to the contrary. There, a homicide was committed by one conspirator, after a robbery had been completed, in making an escape from the scene of the crime. It was held that a fellow conspirator might not be liable for the murder, since the crime of robbery agreed upon had already been accomplished, unless it were shown that killing in the course of an escape were a part of the original plan. There the escape itself was not a crime or a part of the robbery, as it might have been if the defendant, when fleeing, had the loot in his possession. Here it is the very crime which the conspirators had agreed to commit. It cannot be

said that the escape had ended when the homicide occurred. The escape was in full progress when the gas bombs were thrown into the guard room. Almost simultaneously the conspirators discharged their pistols, a bullet from one of which killed Henry Sullivan. By no stretch of reasoning may it justly be said that all hope of escape and all effort to accomplish it had been abandoned before the shots were fired. On the contrary, it appears that the conspirators continued to resist capture by the officers, for a long period after Sullivan had been killed, at a cost to themselves of the death of five of their number.

It remains to inquire whether there was proof that these defendants had made themselves parties to the original conspiracy to escape. It will be remembered that in the beginning the conspirators constituted a group of not more than seven; that these defendants did not belong to the group. The original group, after capturing eight officers, released the convicts in the punishment gallery, among whom were these defendants. Some of the released convicts did not go more than a step from their cells to stand before the openings. It cannot well be said that the persons thus acting joined in the conspiracy. Each cell in which a prisoner had been confined was no more than three feet wide. If one prisoner, whose story was not in this respect disputed, is to be believed, he had been continuously confined in one of these cells for a period of six months, except for one fifteen-minute period in each week, during which he was removed for a shave and bath. If this were the case with others, it was a natural and entirely human act to step from the cells, and betokened no purpose to join in an effort to break prison. These defendants, however, did not thus restrict their activities.

Abundant testimony was given to the effect that the three defendants, Udwin, Thomas and Force, after their release from the punishment cells, armed themselves with pistols; that they joined the original group of conspirators

in the chapel hall; that they were before the screen and guard room door during the long wait. As to Udwin, this appears in addition: In front of the guard room door Udwin searched the warden for money and took it from him. To Officer Hugunin he said: " We are going to get out of here but you will never leave anywhere." Again he said to the same officer: " Lets cut this big son-of-a-bitch's throat first and put him up where the rest can see him." Udwin stuck a gun in the face of Officer McTaggart and said that they were all going together. He compelled the same officer to hand over his money. As to Thomas: He was in the guard room just back of Officer Hugunin, holding a pistol to his back. We have already related the scramble which the two had for the pistol. As to Force: He opened the door in the screen to enable the men to get through to the guard room door. The evidence is conclusive that the three defendants joined the original conspirators and took active part in furthering the escape. They were clearly fellow conspirators.

Our attention has been called to the precise reading of section 1695 of the Penal Law: " A prisoner confined in a state prison for a term less than for life, who attempts although unsuccessfully, to escape from such prison, is guilty of felony." It is said that Force, a life prisoner, could not have been guilty of an offense under this section, since he was not a prisoner confined " for a term less than for life." The answer is that many of the convicts, engaged in the escape, were not life prisoners, and Force acted in their behalf. " The one who aids and abets the common purpose is as guilty as the one who strikes the fatal blow." (*People* v. *Flanigan*, 174 N. Y. 356, 367.)

We have examined carefully all the charges of error made, and have found none.

The judgment of conviction as to each defendant should be affirmed.

O'BRIEN, J. (dissenting). I cannot vote for affirmance.

If probability or preponderance of evidence were the test, less difficulty would be encountered. By the law of the case the People are burdened with the obligation to establish beyond a reasonable doubt that the shot which killed Sullivan was fired by one of the convicts. If he was killed by officers of the law, then defendants are not guilty. This instruction by the trial justice is a correct statement of the law. A rioter who is engaged in no felonious act except a forcible attempt to break jail and whose criminal associate in such an attempt is destroyed by a " whiff of grape-shot " delivered by the forces of government is not under our statute a murderer. (Penal Law, § 1044.)

In an effort to support the burden which the law imposes, the People endeavored by a process of elimination to show that the killing of Sullivan could not have been effected except by some member of the criminal group to which defendants belonged. The evidence so produced is sufficient to warrant the inference that the fatal shot did not proceed from the reception hall east of the guard room nor from the stairway ascending from the guard room to the warden's kitchen. In both locations armed officers were stationed but the proof is very strong that they withheld their fire. So far, the process of exclusion is good enough. The complete silence, however, respecting the presence or absence of guards outside the door opening from the west wall of the guard room into the prison yard seriously interrupts the continuity of that process. Indeed, it seems to terminate it. That door leads to a porch where guards could have been posted probably without detection by the rioting convicts. It is pierced by a wicket which commands a view of the interior of the guard room and through which revolvers could have been thrust and discharged. No prudent official familiar with tactics suitable for the suppression of outbreaks · by desperate criminals would

disregard its advantages for ambush. It is an ideal spot for the disposition of his forces. Also it was accessible by the auxiliaries from Geneva, Syracuse, Rochester and Auburn who swarmed in and about the prison. Sullivan's body was removed from a spot only a few feet distant from the wicket in that door and directly in line with it. Throughout the riot, Sullivan had charge of the warden and, immediately prior to the throwing of the gas bombs, he walked either at his left side or behind him. As the bombs were thrown, someone struck the warden on the back of the neck. He fell and became unconscious. Shots in the guard room then became numerous. About thirty seconds elapsed between the bomb throwing and the darkening of the atmosphere caused by the gas. During that interval, the shooting of Sullivan from the wicket in the west door would have been entirely feasible. McTaggart, who was handcuffed to the warden and was walking beside him in a northerly direction, describes the sound of shots as proceeding from the west. " It came from the left hand side toward the prison yard, in other words the west side. * * * All the shots I heard came from that section. * * * I heard the report, four or five reports, that sounded like gun fire that came from that section of the room." Sullivan was known as one of the foremost leaders of the mob, its principal spokesman and the custodian of the warden. He had been implicated in the previous July outbreak at the prison and was recognized as a resolute and dangerous character. The fear or hatred with which the guardians of the law regarded this obnoxious and formidable enemy of order and discipline may be inferred from the fact that when he was dragged from the guard room, unconscious and probably dead, twice again they shot him. To the end that the attempted process of elimination might in fact eliminate, ought not the People to have shown that none of the many prison guards, State troopers, municipal police and National guardsmen

in and around the prison that day had taken their stand on the porch outside the wicket in the west door of the guard room and, even against orders, had shot this criminal in control of the warden who had just been felled by a blow? Two of the possible sources of the death dealing bullet have been successfully excluded. The third has been utterly ignored. The guilt of these defendants requires demonstration beyond a reasonable doubt. I do not think that it has been proved up to the point where fair inferences exclude their innocence.

CARDOZO, Ch. J., POUND, CRANE, LEHMAN and HUBBS, JJ., concur with KELLOGG, J.; O'BRIEN, J., dissents in opinion.

Judgments affirmed.