THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.*
AARON HALL, Appellant.

1. MURDER — SUFFICIENCY OF EVIDENCE. The evidence upon a trial
for homicide reviewed and held sufficient to support a verdict convicting
the defendant of the crime of murder in the first degree.

· 2. WHEN MOTION FOR RESETTLEMENT OF CASE PROPERLY DENIED.
The denial of defendant's motion to resettle the case by striking out the
indictment and the minutes of the court showing the arraignment, plea
and demand for trial, will not be held improper, where the motion was
based upon the unsupported affidavit of an attorney that such entries
and recitals were false and were made without authority after the trial
was ended, and the motion was made before the trial judge, who must
have known whether most of the allegations in the moving affidavit were
true or not.

3. REMOVAL OF CAUSE — SUFFICIENCY OF AFFIDAVIT. The sufficiency
of the affidavit upon which was founded an order removing into the

Supreme Court an indictment found in the Court of General Sessions cannot be questioned on a motion in arrest of a judgment of conviction, where the defendant submitted without protest to the jurisdiction of the Supreme Court and demanded a trial therein upon the indictment.

4. CONSTITUTIONAL LAW — APPOINTMENT OF SPECIAL JURY COMMISSIONERS BY APPELLATE DIVISION JUSTICES.   Chapter 378 of the Laws of 1896, conferring the power of appointment of special jury commissioners upon justices of the Appellate Division of the Supreme Court does not violate either section 2 of article 6 of the Constitution, prohibiting such justices from exercising any of the powers of a justice of the Supreme Court other than those of a justice out of court, or section 10, prohibiting a justice of the Supreme Court from holding any other office or public trust, because justices of the Appellate Division may exercise all the powers which unassigned justices of the Supreme Court can exercise out of court; and although such power of appointment is a public trust, the legislature may properly confer it upon ordinary justices of the Supreme Court, for the reason that the discharge of the duties of the commissioners aids the justices in the performance of their judicial functions.

5. TRIAL BY SPECIAL JURY — SUFFICIENCY OF AFFIDAVIT.   Jurisdiction is given to the Appellate Division of the Supreme Court to make an order that a criminal trial be had by special jury as provided by section 13, chapter 378, Laws of 1896, by the statement in the affidavit upon which it acted that the indictment was for murder in the first degree, since a trial involving the life of a human being is of such "importance," both to him and to the public, as to bring the case within the meaning of that word as used in the statute.

6. MISDESCRIPTION IN AFFIDAVIT.   The fact that a person making the affidavit to procure an order for a special jury described himself as "Deputy Assistant District Attorney," when there was no such office, is insufficient as a ground for challenge to the panel.

7. NOTICE OF APPLICATION FOR ORDER.   The failure to personally serve upon defendant notice of an application for the order is no ground for challenge to the panel, where notice is given to his attorney, who appears and opposes it but makes no objection upon that ground, since the giving of such notice satisfies the requirement of the statute that notice of the motion be given.

8. APPEAL.   Appeals in criminal cases must be considered and decided upon the merits, so that delays may be avoided and justice may be done.

(Argued November 18, 1901; decided December 20, 1901.)

APPEAL from a judgment of the Supreme Court, rendered at a Trial Term for the county of New York June 25, 1900, upon a verdict convicting the defendant of the crime of

murder in the first degree, and in connection therewith an appeal from two orders made at said term, one denying the defendant's motion for a new trial, and the other denying his motion in arrest of judgment; also an independent appeal from an order of the trial judge denying a motion of the defendant to resettle the case.

The facts, so far as material, are stated in the opinion.

*Charles Haldane* and *Abraham Levy* for appellant. The statute, chapter 378 of the Laws of 1896, under which the special jury was ordered, is unconstitutional. (*Matter of Hathaway,* 71 N. Y. 238; *Newell* v. *People,* 7 N. Y. 9; *Striker* v. *Kelly,* 7 Hill, 9; *Beekman's Case,* 11 Abb. Pr. 164; *D. R. P. P. Co.* v. *Mayor, etc.,* 52 Hun, 542; *People ex rel.* v. *Nichols,* 52 N. Y. 478.) The order of the Appellate Division directing the drawing of a special jury was made without jurisdiction, and is void. (*Davidsburgh* v. *K. L. Ins. Co.,* 90 N. Y. 526; *Risley* v. *Phenix Bank,* 83 N. Y. 318; *Mayor, etc.,* v. *Furze,* 3 Hill, 612; *Manhattan Co.* v. *Lydig,* 2 Caines, 380; *Livingston* v. *C. Ins. Co.,* 2 Caines, 28; *People* v. *Vermilyea,* 7 Cow. 108; *Hartshorne* v. *Gelston,* Col. & Cai. 434; *Wilson* v. *Mayor, etc.,* 1 Den. 595; *Hutson* v. *Mayor, etc.,* 5 Sandf. 289; 9 N. Y. 163; *People* v. *Suprs. of New York,* 11 Abb. Pr. 114.) The trial court erred in sustaining the district attorney's exception to the defendant's challenge to the panel of special jurors. (*Friery* v. *People,* 2 Keyes, 424; *People* v. *Tweed,* 50 How. Pr. 262.) The court in which the defendant was tried had no jurisdiction to try the indictment against him. (*People* v. *Baker,* 3 Park. Cr. Rep. 181; *People* v. *Vermilyea,* 7 Cow. 141; *Jones* v. *People,* 79 N. Y. 45.)

*Eugene A. Philbin, District Attorney* (*Charles E. Le Barbier* and *Henry P. Keith,* of counsel), for respondent. The statute, chapter 378 of the Laws of 1896, under which the special jury was ordered, was constitutional. (*People* v. *Dunn,* 157 N. Y. 528; *People ex rel.* v. *Nichols,* 52 N. Y.

478.) The learned trial court properly sustained the district attorney's exception to the defendant's challenge to the panel of special jurors. (*People* v. *Petrea*, 92 N. Y. 144; *Friery* v. *People*, 2 Keyes, 425; *Ferris* v. *People*, 35 N. Y. 125; *Wynehamer* v. *People*, 13 N. Y. 378; *Matter of McAdam*, 27 N. Y. Supp. 353; *People ex rel.* v. *Bd. of Suprs.*, 70 N. Y. 228.)

Vann, J. The defendant was indicted for the crime of murder in the first degree, committed in the county of New York on May 17, 1900, by shooting Mary McCarthy with a pistol and thus causing her death. Upon his arraignment he entered the plea of not guilty, without any specification of insanity. His trial in June, 1900, resulted in a verdict of murder in the first degree, and the usual sentence was passed upon him.

The defendant was a barkeeper by occupation, although he was out of work at the time of the homicide. He was not addicted to drink, but otherwise his habits and character were not shown. He is a young man, although his precise age does not appear, and Mary McCarthy was a young woman about twenty-five years of age at the date of her death. She was a clerk in the store of Reinhardt Brothers on the southwest corner of Eighty-sixth street and Third avenue in the city of New York, and her duties kept her at the ribbon counter. She was an industrious young woman, of whom all spoke well, and there was no evidence which in any way reflected upon her character. The evidence tended to show that about eighteen months before her death she was engaged to be married to the defendant. At that time he saw a good deal of her and waited upon her, but after a while she ceased to welcome his attentions and finally repulsed him. She lived with a widow lady named Gouldsbury, who testified that one evening about two weeks before the homicide, the bell rang, Mary went to the door and soon after she heard her scream. Upon going down stairs she found the defendant and Mary together and asked the latter, " Why did you come

down stairs ? " when the defendant said to Mary, " I am willing to do ten years for you and I have made every preparation for it." Mrs. Gouldsbury told him she would have him arrested and he said he did not care. Shortly afterward, when he left the house, neither of the young people bade the other good-bye. A few days later, as Mrs. Gouldsbury and Mary were on their way to church, the defendant approached them and caught hold of Mary's arm. Mrs. Gouldsbury passed on but soon returned and asked Mary if she was coming to church with her, and the defendant said, " No, she is coming with me." Thereupon he drew a pistol from his pocket and pointing it at her said, " You go." Mrs. Gouldsbury went on alone, and the defendant went to the door of the church with Mary, but did not go inside. Not long before the homicide, as Mrs. Gouldsbury testified, the defendant followed Mary and herself on their way to Carnegie Hall, and she said to him, " Mr. Hall, I do not want you to follow us," and he replied, " I am not following you, I am following her." She told him he had no right to follow her, to which he made no reply. After this he went home with Mary once or twice from the store where she was employed, and on one occasion was seen apparently waiting for her after she had left. There was very little other evidence as to the previous relations of the parties.

At about half-past eight on the morning of May 17th, 1900, a witness named Rubinsky, who tended bar in the day time at a music hall where the defendant had formerly tended bar at night, saw the defendant and at his request gave him a drink of whisky. After the defendant had swallowed the whisky he asked Rubinsky for a nickel for car fare, saying he had ten cents but needed it to get a shave, and that he wanted to go down town and commit murder. The witness, thinking he was not in earnest, gave him the nickel, and the defendant thereupon handed him a pawn ticket for five dollars upon an overcoat, and asked him to take care of it, without any explanation.

In less than an hour after this interview with Rubinsky, or

at about half-past nine, the defendant entered the store of Reinhardt Brothers, with his right hand in his pocket and a partially smoked cigarette in his mouth, and walked toward the counter where Mary McCarthy was usually occupied. She had been waiting on a customer and had just replaced a roll of ribbons on the shelf, when, as she turned around, she was confronted by the defendant standing on the opposite side of the counter, but a few feet from her, with a pistol in his hand. He raised the pistol and she said, " Oh, Ed, don't; don't, Ed ;" but he shot her. The bullet entered her mouth and, hitting a tooth, was deflected downwards and penetrated her lungs. She ran toward the rear of the store, and the defendant followed her, with his hand extended holding the pistol, when one of the proprietors caught him by the arms and tried to hold him. The defendant, flourishing his pistol, said, " If you don't let go of me I will put it into you," and thereupon he was released. He at once ran after Mary, raised his pistol, took aim at her and fired the second time as she turned around the end of the counter, but apparently did not hit her. With the blood gushing from her mouth, she ran toward the front of the store, was helped to a point near a radiator, where she fell to the floor and died.

After the shooting, by advice of one of the clerks, the defendant put the pistol in his pocket and remained in the rear of the store for a short time until he was taken into custody. While there, he threw away the butt of a cigarette which he held in his left hand, took out a fresh one, lighted it and began to smoke. The excited clerks crowded around him. When asked by one why he shot Mary, his answer was, " She expected it; she knew it was coming." To another who asked, " Aren't you sorry for what you have done ?" he answered, " No, she expected it." Some one said to him, " Man, what you did," and he replied, " I know what I did, she expected it long ago." Still another said to him, " I would like to riddle you with bullets for doing that," and he replied, " Never mind that, save your trouble, don't go to any bother." According to the statement of one witness when told that

Mary was dead he said, " Is that so, I am glad to hear of it
then." He handed the pistol to the arresting officer volunta-
rily and was led, without resistance, to the radiator where the
body of the dead girl was lying. The policeman asked some
one who was wiping the blood from the mouth of the young
woman, where she was shot and the answer was, " I do not
know." The officer turned to ask the defendant why he shot
her, but before he had time to do so the defendant said, " I
put two in her and there is three others in the pistol I gave
you." The policeman asked, " Why did you shoot her ? " and
he said, " I have lost two or three places on her account." He
said to another officer who took him to the station house that he
was about five feet from Mary when he fired the first shot and
when asked, " Do you think the second shot took effect ? "
replied, " No, I think it was the first shot that done her, it
entered her mouth." He said that he saw the girl the night
before and wanted to speak to her, but she would not speak to
him and threw him down, when he went home and went to bed
and could not sleep, thinking over his trouble with her. He
also said that on the morning of the homicide he took the pistol
from a drawer in his room where he usually kept it, and that
he did not know what his intentions then were. When asked
at the police station if he had made any attempt to run away
he said, " No, that would have been of no use ; I would have
been caught anyhow and I had no money to go anywhere."
Another policeman conversed with him at the station house at
about ten o'clock on the morning in question and asked him
why he shot the girl, and he replied, because she threw him
down. " Well," said the officer, " she was a good girl ? "
" Yes," said the defendant, " she was a good girl." He was
then asked, " What do you mean by throwing you down ? "
and he said, " Well, I lost a couple of places through her."
The inquiry continued : " How could a good girl make you
lose any of your positions ? " and he answered, " She didn't
want to have anything to do with me and I got kind of care-
less." He also told this officer that he met her the night
before by appointment ; that both were excited and they had

some excitable talk ; that he did not threaten her but walked a block with her when she left him and he went home. He further said that when he took the revolver from his drawer that morning he intended to frighten her, and that if she had not run away he would not have shot her.

All the witnesses who observed him in the store, on his way to the police station and afterward, although somewhat excited themselves, described him as free from excitement or nervousness and as cool, calm and collected, with no flush on his face and no more pallor than usual, for he was usually somewhat pale. There was no nervous movement of the hands, nor twitching of the muscles of the face. His words were quiet and sensible. He spoke in a calm, even, ordinary tone, was apparently unconcerned, with no sign of bravado or of regret. As he stood by the radiator looking down upon the dead body he still smoked his cigarette.

No witness was sworn for the defendant, who rested when the People closed their evidence. His counsel does not ask us to review the facts, but rests his appeal upon certain rulings which he claims were erroneous. Still, we have carefully reviewed the facts, and without discussing them announce as our conclusion that the evidence amply justified the jury in finding that the defendant shot Mary McCarthy with the deliberate and premeditated design to effect her death.

Before we consider the questions relied upon by the appellant to reverse the judgment, it is necessary to decide the appeal from the order of the trial judge refusing to resettle the case. The motion made for this purpose sought to strike out the indictment and the minutes of the court showing that the defendant was arraigned, entered a plea of not guilty and demanded a trial upon the indictment. The indictment was found in the Court of General Sessions, but on motion of the district attorney an order was made removing it into the Supreme Court. According to the provisions of the Code of Criminal Procedure a certified copy of the order of removal " must be delivered to and filed with the clerk of the court where the indictment is pending ; who must thereupon trans-

mit the same with the pleadings and proceedings in the action
*   *   *   to the court, to which the action is removed."
(§ 351.)   " An order for the removal of the action is of no effect,
unless a certified copy thereof be filed, as required by section
351, before a juror is sworn to try the indictment."   (§ 353.)
Upon the records of the Supreme Court there is an entry of
" a true extract from the minutes " of the Court of General
Sessions, certified by its clerk, stating that on the 25th of
May, 1900, the defendant was arraigned in that court upon
the indictment and entered the plea of not guilty.   Under
date of June 18, 1900, there is the further entry on the min-
utes of the clerk of the Supreme Court that the defendant
was " in due form of law arraigned at the bar upon an indict-
ment for murder in the first degree, of one Mary McCarthy,
and having heard the indictment read and being asked
whether he demanded a trial thereon, answers that he does
require a trial and says that he is not guilty thereof."   The
defendant asked by said motion to strike out the indictment
and the above-named entries upon the record.

It will be seen from this statement that the object of the
motion was not to resettle the case, but to strike from the
records of the court so vital a part of the minutes of its clerk
as to leave the trial court without jurisdiction to try the
defendant.   Such a motion should be granted only upon con-
clusive evidence.   The trial judge was asked, however, to
strike from the records of his court entries and recitals made
while he was presiding and, as it is to be presumed, under his
direction, upon the unsupported affidavit of an attorney, who
swore upon information and belief derived from his constant
attendance in court at every stage of the proceedings in the
action, that said entries and recitals were false and were made
without authority after the trial had ended.   There was no
effort to corroborate this astounding statement, although if it
was true, evidence to sustain it must have been abundant and
near at hand.   Even the defendant himself, who knew whether
he had been arraigned and had entered a plea in the Supreme
Court, made no affidavit upon the subject.   No certificate

from the clerk of the Court of General Sessions was pro-
duced, nor even an affidavit of some one who had searched
the records of that court in order to see whether the sections
above cited from the Criminal Code had been complied with.
We cannot hold that such a motion, based upon such evidence,
with no attempt to corroborate, when corroboration was so
easy, made before a judge who must have known whether the
most of the allegations in the moving affidavit were true or
not, was improperly denied, and, therefore, the defendant's
appeal from such order cannot be sustained.

This conclusion makes it unnecessary to consider the suffi-
ciency of the affidavit upon which the order of removal was
founded, for, by pleading without complaint or question in a
court of general jurisdiction, the defendant waived all pre-
ceding errors of procedure. According to the record, he
submitted without protest to the jurisdiction of the Supreme
Court, demanded a trial therein upon the indictment, and
after he had been tried and convicted he could not, on a
motion in arrest of judgment, properly claim that the Supreme
Court had no jurisdiction to try him, because the indictment
had been removed into that court upon an insufficient affidavit.

The defendant founds his appeal from the judgment upon
a challenge to the panel of special jurors. Said challenge is
based upon sixteen specifications, to all but the thirteenth of
which the district attorney excepted, pursuant to section 364
of the Code of Criminal Procedure, and the trial court sus-
tained the exceptions. The district attorney denied the alle-
gations of the thirteenth specification, and after a trial of the
question of fact, it was properly decided according to the evi-
dence, and thereupon the challenge was overruled. A chal-
lenge to the panel "can be founded only on a material
departure, to the prejudice of the defendant from the forms
prescribed by the Code of Civil Procedure, in respect to the
drawing and return of the jury, or on the intentional omission
of the sheriff to summon one or more of the jurors drawn."
(Code Cr. Pro. § 362.)

The defendant, however, claims that the statute under

13

which the special jury was ordered is unconstitutional, and that even if it is constitutional, the order of the Appellate Division directing the drawing of the special jury was void, because it was made without jurisdiction. (L. 1896, ch. 378.) We carefully considered said statute in a recent case where the following broad question was certified to us by one of the Appellate Divisions : " Is the act of the legislature embodied in chapter 378 of the Laws of 1896, providing for a special jury in criminal actions in certain cases, a valid and constitutional exercise of legislative power ? " (*People* v. *Dunn*, 157 N. Y. 528.) We answered that question in the affirmative, and this leaves little to be now said. As the defendant claims that certain objections to the constitutionality of the act now raised by him were not passed upon by us in the case cited, we will briefly announce our conclusions. He first attacks the power of the justices of the Appellate Division to appoint a special commissioner of jurors, and then insists that, even if the act is constitutional, the Appellate Division had no jurisdiction to order that the trial be had by a special jury, for the want of a sufficient affidavit. He relies upon section 2 of article 6 of the Constitution, which provides that " no justice of the Appellate Division shall exercise any of the powers of a justice of the Supreme Court, *other than those of a justice out of court*, and those pertaining to the Appellate Division or to the hearing and decision of motions submitted by consent of counsel ; " and upon section 10 of the same article, which prohibits justices of the Supreme Court from holding " any other office or public trust."

The statute provides for the appointment of a special commissioner of jurors by " the justices of the Appellate Division of the Supreme Court in the department within which each county embraced by this act is situated," and that " the appointment shall be made by a majority of the justices, in writing, and filed in the office of the clerk of the county." (L. 1896, ch. 378.) The object of the limitation placed by the Revised Constitution upon the power of justices of the Appellate Divisions, was to save their time for appellate work

by preventing them from holding any court, other than that to which they are specially assigned. They can, however, exercise all the powers which an unassigned justice of the Supreme Court can exercise out of court. They have the same powers out of court that they had before their designa-' tion. As the order appointing the special commissioner was made out of court, we reach the question whether the legislature could confer the power of appointment upon an ordinary justice of the Supreme Court.

The Constitution of 1846 provided that judges of the Court of Appeals and justices of the Supreme Court should not " exercise any power of appointment to public office," but this provision was omitted in the revision of the judiciary article in 1870, and it does not appear in our present Revised Constitution. (Const. 1846, art. 6, § 8 ; Revised Const. art. 6.) The omission of the express prohibition excludes one by implication. But, while a justice of the Supreme Court is no longer prohibited absolutely from appointing to public office, a limitation is placed upon his powers in this regard by the provision that he " shall not hold any other office or public trust." (Art. 6, § 10.) The power to appoint a special jury commissioner is a public trust, because it is intrusted to public officers, to be exercised in behalf of the public, by clothing a private citizen with the powers and duties of public office. Unless, therefore, it has some reasonable connection with a judicial purpose, it is not a part of a judicial office and cannot be imposed upon a justice of the Supreme Court. (*Matter of Davies*, 168 N. Y. 89.) What, however, is more germane to the judicial function than the selection of proper jurors to aid in the administration of justice? The right of the jury to decide all issues of fact presented to the court at which they attend, makes their selection a judicial purpose of the highest importance. It is an invaluable aid to the discharge of judicial duties, and hence may be attached by the legislature to the judicial office, as incidental to the exercise of the usual powers of that office. The appointment of a jury commissioner rests on the same principle as that of stenographers,

judges' clerks and the like. The appointment of such officers is authorized because the discharge of their duties aids the judges in the performance of their judicial functions; and so the appointment of a special jury commissioner to select jurors aids the judges in transacting the usual business of their courts. We think the act in question is free from any objection founded on the Constitution.

The statute authorizes the Appellate Division, upon the application of either party, founded on the indictment, the plea thereto, an affidavit and five days' notice, to order that the trial be had by a special jury, where it appears that a fair and impartial trial cannot be had without it, or that the importance or intricacy of the case requires it, or that from the notoriety of the case an ordinary jury cannot be obtained without delay and difficulty, or that for any other reason the due, efficient and impartial administration of justice requires a trial by special jury. (L. 1896, ch. 378, § 13.) The affidavit upon which the Appellate Division acted in ordering a special jury in this case stated, among other things, that the indictment was for murder in the first degree. This was enough to give the Appellate Division jurisdiction, in its sound discretion, to make the order, for a trial involving the life of a human being is of such importance, both to him and to the public, as to bring the case within the meaning of that word as used in the statute. In prescribing the qualifications of special jurors, the legislature seems to have had capital cases primarily in mind, for the commissioner is prohibited from selecting any person as a special juror, "who possesses such conscientious opinions with regard to the death penalty as would preclude his finding a defendant guilty if the crime charged be punishable with death," or "any person who possesses such opinions as would prevent his finding a verdict of guilty in any case upon circumstantial evidence," or "any person who avows such a prejudice against any particular defense to a criminal charge as would prevent his giving a fair and impartial trial upon the merits of such defense." (§ 8.) The commissioner is required to personally examine every one

selected as a special juror with reference to these matters among others before making the selection. (§ 9.) While a party has the same number of peremptory challenges and the same challenges for cause to be tried in the same manner as upon a trial with an ordinary jury, the rulings of the trial court in admitting or excluding evidence upon the trial of any challenge for actual bias are not subject to exception, and such rulings and the allowance or disallowance of the challenge are final. (§§ 18, 19.) These provisions are designed to avoid the " delay and difficulty " named in the statute, which is so frequently experienced in impaneling a jury in a capital case. The necessity of alleging facts to show how the case was brought within the statute was met in this'instance by the simple allegation that the indictment was for the crime of murder in the first degree.

The specification in the challenge that the person making the affidavit to procure the order for a special jury, described himself therein as " Deputy Assistant District Attorney," when there is no such office, is unsound. The order recites that it was made on motion of the district attorney in person and the *descriptio personæ* of the affiant is of no importance. He signed the affidavit as an individual without adding any title. He swore to it as an individual, subject to the pains and penalties of perjury if any material allegation was untrue. The description of the position he held was immaterial, for the affidavit would have the same legal effect, whether it was omitted or inserted.

The specification that " no notice of the application for said order was ever personally served upon the defendant " is also insufficient as a ground of challenge. Notice was given to the attorney for the defendant, who appeared and opposed the application, but made no objection because the defendant did not have personal notice. The statute does not provide for personal notice, for it simply requires " five days' notice of motion." This requirement is satisfied by notice to the attorney for the defendant. .

We have examined the other specifications, which are not

meritorious, but purely technical and such as may well be disregarded because they do not affect the substantial rights of the defendant. (Code Cr. Pro. § 542.) The section cited is a statute of jeofailes, applied to criminal practice, and its command that "the court must give judgment, without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties," is designed to secure promptness in the administration of justice by preventing new trials, except when substantial justice requires it. The complement of the statute is found in section 527, which authorizes a new trial if the court is satisfied that justice requires one, "whether any exception shall have been taken or not." Thus, the theory upon which the legislature commands appellate courts to administer the criminal law is, on the one hand, to disregard technical errors not affecting substantial rights, and, on the other, to do justice regardless of exceptions. The rule now governing appeals in criminal actions is that they must be considered and decided upon the merits, so that delays may be avoided and justice may be done. We find no reversible error in the decision of the trial court overruling the challenge to the panel.

Two exceptions were taken to rulings relating to evidence and one to the denial of a motion to withdraw from the jury the power to convict of murder in the first degree. No exception was taken to the charge, which was fair and impartial. No exception was argued or placed upon the printed points of the counsel for the appellant except that taken to the ruling upon the challenge to the panel. After examining all the rulings, whether excepted to or not, and carefully reading all the evidence, we find nothing that calls for a reversal. We are of the opinion that the defendant had a fair trial and that he was lawfully convicted of the crime charged.

The judgment of conviction and orders should be affirmed.

Parker, Ch. J., O'Brien, Bartlett, Martin, Landon and Cullen, JJ., concur.

Judgment accordingly.