BANCO POPULAR DE PUERTO RICO, como Liquidador del BANCO TERRITORIAL Y AGRÍCOLA DE PUERTO RICO, peticionario, *v.* CORTE DE DISTRITO DE SAN JUAN, HON. B. MARRERO RÍOS, JUEZ INTERINO, demandada.

Núm. 1552.—*Sometido:* Diciembre 8, 1943. *Resuelto:* Febrero 9, 1944.

*Damián Monserrat, Jr., Gabriel de la Haba y Rafael Baragaño, Jr.,* abogados del peticionario; *Hon. Procurador General Interino M. Rodríguez Ramos y R. Rivera Zayas,* abogados de los miembros de la Comisión Investigadora de la Cámara de Representantes.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

El Banco Territorial y Agrícola de Puerto Rico ha estado bajo liquidación en la Corte de Distrito de San Juan durante algunos años, de conformidad con la Ley núm. 17, Leyes de Puerto Rico, 1933. El peticionario, Banco Popular de Puerto Rico, ha sido el liquidador estatutario desde el 1937 hasta la fecha. El 23 de junio de 1942 el peticionario radicó una moción en los procedimientos de liquidación solicitando que se vendieran en pública subasta el remanente de los activos del Banco Territorial. Luego de la debida notificación y de celebrarse una vista, no habiéndose radicado oposición alguna a la moción, se ordenó, se publicó y se celebró la referida subasta pública. Más tarde, por moción radicada por el peticionario, y después de una vista sobre

la misma, el 7 de enero de 1943 la corte de distrito dictó una resolución aprobando, con algunas excepciones de poca importancia, la venta del remanente de los activos. Contra esta resolución no se entabló recurso de apelación alguno.

El 5 de agosto de 1943 el peticionario radicó una moción solicitando de la corte de distrito (*a*) que aprobara su informe final de la liquidación del Banco Territorial, y (*b*) que relevara y descargara al peticionario de toda ulterior responsabilidad, en relación con los procedimientos de liquidación. Antes de que la corte inferior dispusiera de esta moción, los miembros de una Comisión Especial Investigadora de las Instituciones Bancarias en Proceso de Liquidación, de la Cámara de Representantes, por conducto del Procurador General, radicaron una moción fechada el 13 de octubre de 1943 ante la corte de distrito alegando que la referida Comisión, de conformidad con una resolución de la Cámara, estaba investigando la subasta aquí envuelta, y rendiría a la Cámara un informe de dicha investigación con el fin de "someterlo a la consideración de esta Honorable Corte como fuente de información y material de investigación, antes de que esta Corte arribe a conclusiones finales sobre el informe y las cuentas presentadas por el liquidador." La moción, copiaba lo siguiente de la resolución creando la comisión investigadora, "la creencia de que hubo cierta anormalidad e irregularidad, festinación y falta de claridad en la adjudicación que se hizo al venderse en pública subasta ciertos créditos y obligaciones a cobrar pertenecientes al Banco Territorial y Agrícola de Puerto Rico valorados nominalmente en aproximadamente $420,000, cuya subasta tuvo lugar allá por el día 30 de octubre de 1942, la cual se efectuó por una suma que escasamente cubre el 2 por ciento de dicho valor nominal." La moción finalizaba como sigue:

"7. Que los peticionarios estiman esencial para la mejor administración y desempeño de la función judicial en este caso, que esta Honorable Corte tenga a su disposición todos los informes y datos

que la Comisión Especial Investigadora de la Cámara haya recogido en la amplitud de las audiencias públicas, a fin de que la resolución judicial no resulte incongruente con el resultado de la investigación legislativa, en perjuicio y detrimento de los intereses públicos envueltos.

"Por tanto, vuestros peticionarios respetuosamente sugieren y suplican:

"(a) Que esta Honorable Corte se sirva diferir la resolución sobre el informe final de la liquidación del Banco Territorial & Agrícola de Puerto Rico hasta que la Comisión Especial Investigadora de la Cámara rinda su informe y copia del mismo se someta a esta Honorable Corte, sin perjuicio de dar por terminada la liquidación, a fin de evitar que se continúen haciendo para ello gastos innecesarios. . . ."

La corte de distrito celebró una vista y oyó prueba sobre esta moción. El 12 de noviembre de 1943 la corte de distrito dictó una resolución que dice en parte como sigue:

"Por cuanto: esta Corte no tiene dudas de que el informe de la citada Comisión Investigadora la ayudará grandemente en las conclusiones a que habrá de llegar al aprobar finalmente la liquidación del Banco Territorial y Agrícola ni de que todo ello redundará en beneficio de la comunidad en general por haber tenido el Banco que fué objeto de liquidación innumerables depositantes de escasos recursos;

"Por cuanto: el informe de la ameritada Comisión Investigadora, según la prueba testifical aducida, quedará terminado y copia del mismo será sometido a esta Corte antes de cuatro meses, a partir del 27 de octubre último;

"Por tanto: se declara con lugar la anterior moción radicada por los Sres. Piñero, Quiñones, Ellsworth, Nevares Santiago y Reguero González y en su virtud difiérase la resolución de esta Corte sobre el informe final de la liquidación del Banco Territorial y Agrícola de Puerto Rico hasta que la Comisión Especial Investigadora de la Cámara de Representantes de Puerto Rico arriba nombrada, rinda su informe y someta copia del mismo a esta Corte, sin perjuicio de dar por terminada la liquidación."

A solicitud del Banco Popular para que se dictara un *certiorari* expedimos el auto con el fin de revisar esta resolución en los méritos, en vista de la alegación de que la re-

solución infringía la doctrina constitucional en cuanto a la separación de poderes (Ley núm. 32, Leyes de Puerto Rico, 1943, pág. 85).

La doctrina de la separación de poderes, tal como ha sido declarada originalmente en las constituciones Federal y Estatales, y tal como se ha aplicado a situaciones específicas que han surgido durante los últimos ciento cincuenta años, ha sido alguna que otra vez entendida imperfectamente. Es fácil para los teóricos políticos afirmar locuazmente que la división de los poderes gubernamentales consiste de lo siguiente: la rama legislativa inicia la política, la ejecutiva la pone en ejecución, y la judicial resuelve las controversias que surgen de la misma. Pero esto dista mucho de ser la contestación a los múltiples problemas engendrados por esta doctrina gubernamental. Sólo define en vez de resolver los problemas realmente difíciles.

Corriendo el riesgo de repetir lo que es obvio, es saludable recordar el génesis de la doctrina de la separación de poderes. "Con razón justificada fué que los americanos, basados en la experiencia, casi en seguida que se declaró la independencia, establecieron por escrito normas de gobierno o constituciones y usaron como base la separación de poderes y como portada una declaración de derechos. Desde el principio hasta la revolución las colonias habían estado sujetas a un gobierno completamente centralizado, sin distribución de poderes, y sabían lo que significaba esta clase de gobierno. . . No es de extrañarse el que se implantara en América esta doctrina y se incluyera en la declaración de derechos, después de la independencia, cuando se leen las leyes despóticas, que intervenían con toda clase de conducta, creencia y enseñanza del individuo, por las cuales continuamente eran culpables las legislaturas coloniales, o las leyes legalizando testamentos rechazados por las cortes, fijando la administración de herencias particulares, la suspensión del término prescriptivo a un litigante en un caso específico y al eximir a cual-

quier persona de responsabilidad por un delito específico por el cual se hubiera procesado a sus vecinos, de las cuales están llenos los libros de leyes coloniales.'' (Pound, Administrative Law, págs. 51, 52, 54.)

''La subestructura de la nueva nación fué una división tripartita de los poderes gubernamentales, cuyo fin primordial fué, en síntesis, asegurar la libertad del individuo contra la opresión de cualquier rama.'' (Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv. L. Rev. 153, 4.) ''La doctrina de la separación de poderes se adoptó por la Convención de 1787 no con el fin de fomentar la eficiencia pero sí para impedir que se ejercitara un poder arbitrario. El propósito no fué evitar fricciones, pero, mediante la fricción inevitable incidental a la distribución de los poderes gubernamentales entre tres ramas, salvar al pueblo de la autocracia.'' (Brandeis, J., disintiendo en *Myers* v. *United States,* 272 U. S. 52, 293.)

No se puede negar que el amplio principio de la separación de poderes ha sido un factor vital en la conservación de nuestras libertades desde su adopción por los Padres de la Patria (*Founding Fathers*). Pero algunas veces han surgido dificultades debido a la confusión de pensamiento en cuanto a dos problemas causados por el hecho de la existencia de ramas gubernamentales separadas pero de igual calibre.

En primer lugar, muchos han pasado por alto el hecho de que la separación absoluta nunca ha existido y nunca se pretendió que existiera. En verdad, Madison escribió en El Federalista que algunos se oponían a la Constitución por la única razón de que no disponía para una verdadera separación de poderes. Pero, como observó Madison, la frase ''separación de poderes'' es cierta sólo en parte. Nunca se pretendió que cada una de las ramas gubernamentales funcionara en un vacío, completamente independiente y alejada de las otras. Más bien lo que la Constitución protegía fué

descrito como sigue: "La acumulación de *todos* los poderes,
legislativo, ejecutivo y judicial, en las *mismas* manos, bien
de una, algunas o muchas personas, y ya sea por herencia,
nombramiento propio o electivo, puede declararse con razón
que es la definición exacta de la tiranía." (El Federalista
(editado por Lodge), pág. 300—bastardillas nuestras.) En
verdad se ha sugerido que la confusión engendrada por el
uso de la frase "separación de poderes," puede disiparse
describiendo el principio como la "separación de funciones
últimas". (Herwitz y Mulligan, The Legislative Investigat-
ing Committee, 33 Col. L. Rev. 1, 7.) Sea ello como fuere,
a los tribunales les concierne más el significado legal y de
hecho del principio en vez de una selección entre breves des-
cripciones competidoras. Y no se puede afirmar con dema-
siado énfasis que las ramas gubernamentales están tan in-
terrelacionadas en sus funciones como son independientes
entre sí. En la frase de Madison, los poderes gubernamen-
tales han sido mezclados en vez de separarse. Sostenía que
se exigía solamente un grado de separación y que este grado
sólo se podía asegurar relacionando y mezclando las ramas.[1]
Beard, en La República, pág. 190, describe la intervención y
balance (*checks and balances*) que de ello resulta como una
clase de equilibrio dinámico.

---

[1] "Si examinamos las constituciones de los diversos estados, encontramos
que, no obstante los términos enfáticos y en algunas ocasiones absolutos mediante
los cuales se ha establecido este axioma, no hay un solo caso en el cual las varias
ramas del poder han sido mantenidas absolutamente separadas y distintas. El
estado de Nueva Hampshire, cuya constitución fué la última que se redactó, pa-
rece que se percató completamente de la imposibilidad e inconveniencia de evitar
cualquier posible mezcla de estas ramas, y ha limitado la doctrina declarando
'que los poderes legislativo, ejecutivo y judicial se mantendrán tan separados e
independientes de cada uno de ellos como permita la naturaleza de un gobierno
libre; o como pueda ser compatible con esa cadena de conexión que ciñe toda la
estructura de la Constitución en un vínculo indisoluble de unidad y armonía.'"

". . . a menos que estas ramas estén relacionadas y mezcladas de tal modo
que se confiera a cada una un control constitucional sobre las otras, el grado de
separación que requiere la máxima, como esencial para un gobierno libre, no puede
nunca mantenerse debidamente en la práctica." (El Federalista (editado por
Lodge, págs. 303, 8.)

Seguidamente se recuerdan ejemplos que ilustran esta tesis. El ejercicio de una "función legislativa última"—la de hacer las leyes—está sujeto típicamente al veto del ejecutivo. El Presidente puede ser residenciado por la Cámara de Representantes y destituído por el Senado. Todos los ejecutivos subalternos que sirven bajo el Presidente son las criaturas del Congreso. No obstante el Congreso no tiene poder ejecutivo propiamente dicho en el sentido de que puede dirigir la actuación de funcionarios ejecutivos sobre una base diaria. El Congreso tiene el poder de asignar fondos y de declarar guerras; pero el ejecutivo gasta el dinero y sostiene las guerras. El Presidente conduce las relaciones extranjeras. Sin embargo, todos los tratados requieren la ratificación del Senado. Los jueces son nominados por el Presidente, confirmados por el Senado y están sujetos a residencia por la Cámara de Representantes. El Presidente ejercita la alta función judicial envuelta en el poder del perdón. Y las cortes, al pasar sobre la constitucionalidad y el significado de las leyes, concurren en la tarea de dar forma a la legislación. Un reconocimiento completo de la mezcla e interrelación de los poderes gubernamentales ha surgido con la creación de juntas y comisiones que (*a*) promulgan reglamentos que en efecto son legislación, (*b*) aplican leyes y con ello ejercitan funciones ejecutivas y (*c*) deciden casos específicos, ejercitando de esta manera poderes judiciales o cuasi judiciales.[2]

Pero no es suficiente que se conozca el limitado grado de separación envuelto en la separación del poder legislativo,

---

(²) Holmes lo ha expresado así:

"Las grandes disposiciones de la Constitución no establecen y dividen los campos en blanco y negro. Se encuentra que aun las más específicas terminan en la penumbra fundiéndose gradualmente de un extremo a otro. . . . No parece necesitarse argumentación para demostrar que no importa cómo las disfracemos por medio de palabras disimuladoras no podemos obtener la distinción entre funciones legislativas y ejecutivas con precisión matemática y dividir las ramas en compartimientos impenetrables, . . ." (Holmes, J., disintiendo en *Springer* v. *Philippine Islands,* 277 U. S. 189, 209, 211).

ejecutivo y judicial. Nos queda un segundo problema—¿qué es el poder legislativo, ejecutivo o judicial? El poder legislativo, por ejemplo, no es una frase hecha ni un concepto que se define por sí mismo. Una demostración obvia es el poder de una de las cámaras de la Legislatura, en ayuda de sus funciones para hacer las leyes, bajo ciertas circunstancias, de procesar y castigar por desacato. (*Jurney* v. *Mac Cracken*, 294 U. S. 125; *McGrain* v. *Daugherty*, 273 U. S. 135, 171-3.) A primera vista parece que tal poder es sin duda alguna uno de naturaleza judicial. Pero decir que un poder de la legislatura es judicial sólo conduce a confusión. Después de todo, caracterizar tal poder es sólo declarar el resultado y deja inarticulado el razonamiento necesario para llegar a tal resultado. Por tanto, debemos echar a un lado la descripción y examinar cada situación, determinando en un caso específico (1) si la función específica ha sido expresamente asignada por la Constitución a la rama gubernamental que trata de ejercitarla, o (2) si su ejecución por tal rama es un incidente necesario para otras funciones expresamente conferídasle. Y al determinar esta última cuestión el hecho de que una rama pudiera usar los métodos, técnica y equipo tradicionalmente usados por otra rama, es irrelevante. Es decir, la citación de testigos, la práctica de prueba y aun la decisión final de la controversia por la Legislatura en un procedimiento de desacato no es en manera alguna una derogación de la doctrina de la separación de poderes. Como ya se ha indicado, "tanto en las cortes como en las legislaturas, el ejercicio de tal poder no es propósito fundamental de su creación, sino subsidiario a la realización de tal propósito. Les proporciona el poder de funcionar como cortes o como legislaturas. Designar tal poder como 'poder judicial' o 'poder legislativo' erróneamente implica su ejecución exclusiva por uno u otro organismo gubernamental, o, si permite su ejecución por ambos, implica en un caso una excepción al carácter general del poder ejercitado por tal

rama gubernamental. Es correcto, sin embargo, darle al poder el carácter de subsidiario a la ejecución de un poder mayor o más comprensivo para el cual se creó la institución, bien sea la corte o la legislatura. Ambas instituciones, ya imitándose una a la otra o por falta de inventiva ulterior, han adoptado el mismo recurso—encarcelamiento sumario— para llevar a cabo los propósitos fundamentales de su existencia. La sanción judicial para la ejecución de tal poder por la legislatura, descansa en el reconocimiento de la necesidad de que el proceso legislativo funcione.'' (Landis, supra, a la pág. 158.)

Vemos por tanto que el uso de la técnica judicial no es fatal a la ejecución por la Legislatura de una función incidental a y en ayuda de la labor de legislar. El factor primordial es que el propósito último sea legislativo. De la misma manera, esto se ha reconocido en una situación relacionada cuando la legislatura ha tratado en vano de asignar a las cortes deberes no judiciales, dándole la forma de técnica judicial a ser usada en la ejecución de tales deberes no judiciales. Cardozo, con su acostumbrada facilidad de expresión, expone las objeciones constitucionales a tal práctica. Al declarar nula una ley, hablando por la Corte de Apelaciones de Nueva York, en el caso de *In re Richardson,* 160 N. E. 655 (N. Y., 1928), indica que bajo tal práctica un juez (págs. 657, 9) '' . . . se convierte en el delegado del gobernador en ayuda de un acto ejecutivo, la remoción de un funcionario público. *Matter of Guden,* 171 N. Y. 529, 64 N. E. 451. Tan pronto se le ordena, abandona el juez su labor de juzgar, y emprende otro trabajo, el de explorar y aconsejar. Sus conclusiones al ser hechas no tendrán ninguna autoridad de sentencia. Usando la frase de Bacon, ellas no 'expondrán la regla o la sentencia.' No serán preliminares o auxiliares de una regla o sentencia a ser pronunciada por la rama judicial en alguna de sus divisiones. Sólo serán un mero consejo al Gobernador, quien puede adoptarlas, modi-

ficarlas o rechazarlas en total. Desde los comienzos de nuestra historia, se ha seguido el principio de que el Ejecutivo o la Legislatura no tienen poder inherente para asignar al poder judicial funciones administrativas, excepto cuando son razonablemente incidentales en el desempeño de sus deberes judiciales. *People* v. *Hall,* 169 N. Y. 184, 62 N. E. 170; *Matter of State Industrial Commission,* 224 N. Y. 13, 16, 119 N. E. 1027. Las exigencias gubernamentales han hecho necesario que se liberalice una mera adhesión doctrinaria a un principio tan flexible y práctico, que es grandemente una cuestión de juiciosa aproximación, como la de la separación de poderes. La elasticidad no significa que lo que es la esencia de la función judicial pueda ser destruído, convirtiendo el poder para decidir en una débil oportunidad para consultar y recomendar (*cf.* Frankfurter y Landis, Power of Congress, etc.; A Study in the Separation of Powers, 37 Harvard Law Review, 1010, 1020). . . . No hay duda de que existen zonas periféricas en que lo judicial y lo administrativo se confunden entre sí. C. W. Pound, The Judicial Power, 35 Harv. L. R. 787, 789. También otros ejemplos pueden citarse. Greater N. Y. Charter, §1534; *Mitchel* v. *Cropsey,* 177 App. Div. 663, 164 N.Y.S. 336. El centro puede ser puro cuando la frontera es incierta.''

En resumen, el método no es tan importante como la actuación última a realizarse por una rama gubernamental que utiliza un método específico para obtener los datos sobre los cuales basar su actuación. Y la diferencia cardinal entre la actuación final de las tres ramas del gobierno, cada una actuando dentro de su esfera, siempre ha sido razonablemente clara. Una excelente exposición a este efecto se encuentra en *Ex parte Battelle,* 277 P. 725 (Calif. 1929), a la pág. 731, que dice como sigue:

''. . . También creemos oportuno expresar en este punto de nuestra investigación que, por costumbre general, adherida más o menos rígidamente, cada investigación oficial, desde épocas lejanas, ha hecho

uso de métodos de procedimiento parecidos a aquellos que rigen en los tribunales judiciales. Esto es debido a que, en el orden de las cosas, como lo ha demostrado la experiencia humana, se ha probado que tales métodos proporcionan el método más seguro de llegar a la verdad del asunto específico envuelto en la investigación. Sin embargo, no puede decirse que cuerpos legislativos o agencias administrativas u organizaciones municipales o funcionarios ejecutivos por el mero hecho de que empleen métodos de procedimientos parecidos a aquellos empleados o exigidos en los tribunales judiciales, estén dedicados al ejercicio de una función judicial o invadiendo el área asignada exclusivamente a la rama judicial del gobierno estatal. Ha habido alguna confusión en las decisiones judiciales refiriéndose a esta cuestión, cuya disipación está fuera de los límites de la presente investigación, pero no sería impropio en este momento referirnos al comentario de Cooley en su obra Sobre Limitaciones Constitucionales, en el que después de revisar muchas autoridades, llega a la conclusión de: 'Que aquello que distingue un acto judicial de uno legislativo es que el primero es la determinación de lo que la ley actual es en relación con alguna cosa existente que se hizo o que sucedió, mientras que el segundo es una predeterminación de lo que la ley será para la reglamentación de todos los casos futuros cubiertos por sus disposiciones.' En la opinión del Juez Holmes en el comparativamente reciente caso de *Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210, 29 S. Ct. 67, 53 L. Ed. 150, se dice lo siguiente: 'Una investigación judicial indaga, declara y pone en vigor las responsabilidades tales como existen sobre hechos presentes o pasados y bajo las leyes que se supone que ya existen. Éste es su propósito y su fin. La legislación, por otra parte, mira hacia el futuro y cambia las condiciones existentes, creando una nueva regla que se aplicará a todas o a alguna parte de las que están sujetas a su poder. Que los métodos de una se parezcan a los de otra en el curso de sus respectivas pesquisas, teniendo las dos diferentes fines en mente, no es el factor importante o determinante, toda vez que la misma consideración fundamental opera para guiar los pasos de ambas en cuanto al procedimiento.''[3]

---

[3] Para discusiones adicionales de la línea divisoria entre el poder judicial y el legislativo o ejecutivo, véanse *People ex rel. Leaf* v. *Orvis,* 30 N. E. (2) 28 (Ill. 1940); *Coleman* v. *Miller,* 307 U. S. 433 (1939); *Nashville, C. & St. L. Ry.* v. *Wallace,* 288 U. S. 249 (1933); *Opinion of the Justices,* 179 A. 344 (N. H. 1935); *Tutun* v. *United States,* 270 U. S. 568 (1926); Gellhorn, Cases on Administrative Law, págs. 34–159.

Al disponer en la Carta Orgánica el gobierno propio para Puerto Rico, el Congreso usando el lenguaje más amplio y comprensivo que pudo hallar (*Puerto Rico* v. *Shell Co.*, 302 U. S. 253), sabiamente siguió la pauta general de la separación de poderes encontrada en las constituciones Federal y Estatales (Título 48 U.S.C.A. Secciones 771, 811, 861). Por tanto, enfocamos el problema específico levantado por el presente caso con los mismos postes indicadores ya referidos; es decir, (1) la separación de poderes no impide la acción conjunta de las tres ramas coordinadas e iguales del gobierno, que son tan dependientes entre sí como independientes, y (2) no hay usurpación del poder judicial simplemente porque la legislatura, en el curso de una investigación en ayuda de sus funciones legislativas, utiliza los métodos de las cortes.

▇ Limita considerablemente la cuestión envuelta en este caso el indicar al comienzo que el peticionario admitió en la vista oral que la resolución[4] que autoriza la investigación

---

(4) Las Actas de la Cámara de Representantes de la sesión celebrada el 15 de abril de 1943 dicen en parte como sigue:

"Resolución de la Cámara número 13. El señor Piñero presenta la Resolución de la Cámara núm. 13 cuyo título y texto, copiados al pie de la letra, leen como sigue:

" 'Para ordenar una investigación del estado de la liquidación de los bancos Territorial y Agrícola de Puerto Rico y Comercial de Puerto Rico, y especialmente de los procedimientos seguidos para la venta en pública subasta de los Créditos y Obligaciones a cobrar del Banco Territorial y Agrícola de Puerto Rico; para designar una Comisión de esta Cámara para llevar a cabo dicha investigación y rendir informe a esta Cámara, autorizar el nombramiento del personal necesario, y para otros fines.

" 'POR CUANTO: Es de interés público todo lo que se relaciona con la liquidación de los Bancos Territorial y Agrícola de Puerto Rico y Comercial de Puerto Rico, porque en dichas instituciones bancarias habían depositadas fuertes sumas que representaban el capital de numerosas personas de la clase media y de las clases humildes de Puerto Rico.

" 'POR CUANTO: El cierre de dichos dos Bancos ocasionó grave crisis económica y en muchos casos la ruina a un gran número de habitantes de Puerto Rico.

" 'POR CUANTO: Existe la creencia de que hubo cierta anormalidad, irregularidad, festinación y falta de claridad en la adjudicación que se hizo al venderse en pública subasta ciertos créditos y obligaciones a cobrar pertenecientes al Banco Territorial y Agrícola de Puerto Rico, valorados nominalmente en aproximadamente cuatrocientos veinte mil dólares, cuya subasta tuvo lugar allá por el día

aquí envuelta, es válida por sí misma. Por tanto el peticionario en efecto ha abandonado la alegación hecha en su petición de *certiorari* de que la investigación no podría tener fin o propósito práctico, por el fundamento de que la legislatura no podía anular, mediante legislación, la subasta que se investiga.

No tenemos duda de que el peticionario ha hecho una admisión correcta. Desde tiempo inmemorial, el poder de la rama legislativa del gobierno para practicar investigaciones

---

30 de octubre de 1942, la cual se efectuó por una suma que escasamente cubre un dos por ciento de dicho valor nominal.

" 'POR TANTO: Resuélvase por la Cámara de Representantes de Puerto Rico:

" '*Primero:* Nombrar una Comisión compuesta de cinco representantes para que investigue los procedimientos relacionados con la venta en pública subasta de los créditos y obligaciones a cobrar pertenecientes a los referidos bancos Territorial y Agrícola de Puerto Rico y Comercial de Puerto Rico, y particularmente la subasta de bienes valorados en aproximadamente cuatrocientos veinte mil dólares que tuvo lugar allá por el día 30 de octubre de 1942, la cual se efectuó por una suma que escasamente cubre un dos por ciento de dicho valor nominal.

" '*Segundo:* Para llevar a cabo ampliamente los fines y propósitos de la investigación que por esta Resolución se ordena, la referida Comisión de Representantes tendrá poder para celebrar vistas públicas, aún después de terminada la presente sesión anual ordinaria de la Legislatura de Puerto Rico; citar testigos y hacerlos comparecer; tomar juramentos, usar empleados de la Cámara de Representantes como el personal auxiliar que considere necesario para poder llevar a efecto tal investigación. Se autoriza, además, a dicha Comisión a utilizar los servicios de un abogado que le asesore en la labor de estudio y análisis de los procedimientos en virtud de los cuales fueron subastados los referidos créditos.

" '*Tercero:* Dicha Comisión rendirá a esta Cámara de Representantes un informe detallado del resultado de su investigación al iniciarse la próxima Asamblea Ordinaria de la Legislatura de Puerto Rico, y, de ser posible, en cualquier sesión extraordinaria que se celebre después de levantados los trabajos de la presente sesión.'

"Debidamente secundada por el señor Negrón López, dicha Resolución es sometida a votación y aprobada por unanimidad.

"A moción del señor Negrón López se incluye al Banco Industrial de Puerto Rico entre las instituciones a ser investigadas por la Comisión cuyo nombramiento se dispone en el inciso primero de la parte resolutiva de la Resolución que acaba de ser aprobada.

"A moción del señor Valiente se acuerda por unanimidad incluir en la investigación a ser realizada a todos los bancos que actualmente están en proceso de liquidación.

"El señor Presidente designa a los señores Piñero, Quiñones, Ellsworth, Nevárez Santiago y Reguero González, para que constituyan la Comisión Especial Investigadora de las instituciones bancarias en proceso de liquidación.' '

en apoyo de sus funciones legislativas, nunca ha sido atacado con éxito. "El negarle [a la legislatura] poderes para compenetrarse de los hechos, equivale a exigirle que proporcione el remedio en la oscuridad." (Landis, Constitutional Limitations on the Congressional Power of Investigation, supra, a la pág. 209). Estaría de más decir que la reglamentación e inspección de las operaciones de los bancos es una materia válida de legislación. En el pasado nuestra legislatura ha demostrado ampliamente su interés en que se apruebe una legislación adecuada para este campo. (Ley núm. 18, Leyes de Puerto Rico, Sesión Extraordinaria, 1923; Leyes núms. 2, 17, 55, Leyes de Puerto Rico, 1933; Ley núm. 180, Leyes de Puerto Rico, 1942.) Y, como hemos visto, no es censurable el hecho de que, en el curso de una investigación para obtener informes sobre los cuales basar su legislación, la legislatura use una técnica utilizada más comúnmente por las cortes.

Tampoco es fatal a la validez de la Resolución núm. 13 el que omita decir que la investigación en cuestión se practica en ayuda de las funciones legislativas. El único requisito que se exige de esta resolución es que pueda tener un fin legítimo. De ser esto así, las cortes están obligadas a presumir que ése fué el propósito de la actuación legislativa. Esto se ha establecido en el caso de *McGrain* v. *Daugherty*, supra, en el cual se empleó el siguiente lenguaje para una situación similar (págs. 177, 178): "Es cierto que la resolución que ordena la investigación no dice expresamente que se aprobó en ayuda de la legislación; pero sí demuestra que la materia a investigarse . . . . era una que estaba sujeta a legislación y que recibiría gran ayuda material de los informes que la investigación estaba supuesta a producir. . . . El único propósito legítimo que el Senado pudo tener al ordenar la investigación fué el obtener ayuda para la legislación; y creemos que la materia envuelta era de tal índole que debe presumirse que éste era el verdadero propósito. Hubiera sido

mejor un reconocimiento expreso de la cuestión; pero en vista de la materia específica envuelta esto no era indispensable.''

■ Sin embargo, aparentemente el peticionario alega que la resolución en efecto ha sido invalidada por alegados defectos e impropiedades en la moción del 13 de octubre de 1943 y en la resolución del 12 de noviembre de 1943 declarándola con lugar. No podemos convenir con tal posición. ''La fórmula para la validez de un estatuto es lo que razonablemente puede hacerse de acuerdo con el mismo, y no lo que se ha hecho bajo dicho estatuto.'' (*In re Richardson*, supra, a la pág. 661). Por tanto, pasaremos a la petición y a la resolución declarándola con lugar para determinar, no si la resolución y la investigación que se practica de conformidad con la misma son ilegales, sino determinar si la resolución de la corte inferior era impropia.

■ Aquí también las partes no difieren sustancialmente en su afirmación de la regla de derecho pertinente. Mientras asume la posición de que la investigación es válida, sujeta a la limitación de que la legislatura no puede por un mero fíat legislativo revocar o anular la orden judicial aprobando la venta en cuestión, el peticionario admite que siendo válida la investigación, nada hay que impida a la corte inferior, al considerar cuestiones ante ella, de tener acceso a los hechos que la Cámara de Representantes pueda incidentalmente desarrollar al realizar su investigación. ''Puede admitirse que el Congreso no tiene autoridad para obligar la prestación de testimonio con el fin de ayudar en la prosecución de pleitos pendientes; pero la autoridad de dicho cuerpo, directamente o a través de sus comités, a exigir testimonio pertinente en ayuda de su propio poder constitucional, no está limitada porque la información que se pretende obtener pueda también usarse en tales pleitos.'' (*Sinclair* v. *United States*, 279 U. S. 263, 295). Ciertamente aquellos bajo investigación no pueden decir, por ejemplo, que es la exclusiva prerrogativa y deber de la rama ejecutiva del gobierno el perseguir el

fraude. En verdad, si la legislatura se cruza de brazos bajo tal teoría, y si las cortes rechazan tal oferta, ello constituiría un abandono del deber de parte de ambos basado en una aplicación no existente de la doctrina de la separación de poderes.

Por tanto, la cuestión ante nos se contrae finalmente a determinar la manera mediante la cual la corte de distrito puede usar el informe que la Comisión se propone someter. El peticionario tiene razón al sostener que la corte de distrito no está obligada a aceptar los hechos y conclusiones de la Comisión legislativa. Nadie ha levantado la cuestión, y por tanto hemos asumido que al practicar la liquidación de un banco insolvente bajo la Ley núm. 17, Leyes de Puerto Rico, 1933, una corte de distrito ejercita "el poder judicial". En su consecuencia, el permitir que la legislatura o una comisión de una de sus cámaras dicte a una corte el resultado a que deba llegar al decidir cuestiones específicas ante la corte en cualquier etapa de la liquidación aquí envuelta, sería permitir a la legislatura usurpar una función que ha sido otorgada a las cortes. Aquí no nos encontramos en una de las "zonas periféricas" que preocuparon a Cardozo en el caso de *In Re Richardson,* supra, "en la que lo judicial y lo administrativo se mezclan entre sí." Este caso cae dentro del "centro puro" del poder judicial, lejos de la "incierta frontera" donde otras ramas del gobierno se encuentran. Añadimos, para ser justos con la Comisión y su abogado, que ellos no han asumido una posición contraria ante esta corte. Ellos admiten enseguida que el propósito primordial de la Resolución núm. 13 es en ayuda de funciones legislativas, y que cualesquiera hechos descubiertos por la Comisión serán presentados a la corte de distrito solamente, citando el lenguaje de su alegato, "a fin de que le sirva de fuente de información para la investigación que ha de realizar la Corte como requisito de la función judicial".

De igual manera, las partes no están muy apartadas en cuanto a la admisibilidad en evidencia de tal informe. El peticionario parece preocuparse de que bajo la resolución del 12 de noviembre de 1943 de la corte de distrito el informe pudiera ser (*a*) admitido en evidencia y (*b*) no tuviera oportunidad para refutar o explicarlo. El informe propiamente dicho no sería admisible en evidencia, toda vez que necesariamente no habría sido desarrollado bajo todas las salvaguardas tradicionales de un estricto procedimiento judicial (*Thad Benson Carter* v. *Kubler*,    U. S.    , 12 U. S. L. W. 4004, 5, resuelto por la Corte Suprema Nacional en noviembre 8, 1943; *Mayagüez Sugar Co.* v. *Tribunal de Contribuciones*, 60 D.P.R. 753, 766-7). Pero una vez más el Procurador General, como abogado de la Comisión, inmediatamente admite el punto en cuestión. Dice su alegato: "Debemos presumir que la corte inferior al recibir el informe lo utilizará como fuente informativa para ampliar la investigación si fuese necesario y nada más." Por razones que no nos conciernen en este caso, información no disponible a la rama ejecutiva del gobierno algunas veces es descubierta más efectivamente mediante investigación legislativa (*Cf. Sinclair* v. *United States*, supra). En verdad, tales circunstancias presentan una demostración dramática del ya indicado engranaje e interdependencia de las diferentes ramas gubernamentales, que se exige en beneficio de todo el pueblo. Pero una vez que tal informe se trasmita a las cortes y al ejecutivo, cada uno sabrá cómo cumplir su respectiva función.

La resolución del 12 de noviembre de 1943, analizada finalmente, es comparativamente inocua. Dispone la suspensión durante cuatro meses de la resolución a la moción del peticionario de 5 de agosto de 1943, solicitando aprobación de las cuentas finales y descargo de responsabilidad, en vista de la declaración de que para dicha fecha—27 de febrero de 1944—el informe de la Comisión legislativa sería radicado ante dicha corte de distrito. No podemos ver el perjuicio

indebido que sufrirá el liquidador en retardar por cuatro meses con el fin de recibir este informe, esta última gestión formal en un procedimiento de liquidación que se ha continuado durante once años.

Claramente hacemos constar que la posposición aquí envuelta descansaba en la discreción de la corte de distrito. La Comisión no tenía derecho para exigir tal actuación. Pero la corte, de creerlo aconsejable, tenía poder, como parte del procedimiento judicial, para así actuar cuando se lo solicitara la Comisión legislativa. Y en ausencia de que se abusara de tal discreción—cosa que no existe en este caso—esta Corte no intervendrá en contra de tal actuación de la corte inferior.

Quizá no hubiera surgido la controversia que ahora pende ante nosotros si la corte inferior hubiera dicho explícitamente de qué manera iba a usar el informe cuando lo recibiera. Sin embargo, la resolución guarda silencio en cuanto al uso que se dará al mismo. Pero subsiste el hecho de que las partes están sustancialmente de acuerdo en que la corte inferior de ninguna manera estará obligada por los hechos y conclusiones del informe. El origen de las dificultades surgidas en este caso quizá pueda encontrarse en la fraseología de la moción de la Comisión de fecha 13 de octubre de 1943. No puede negarse que dicha moción se redactó en un lenguaje poco afortunado al indicar que el informe se proporcionaría a la corte "a fin de que la resolución judicial no resulte incongruente con el resultado de la investigación legislativa". Pero queda el hecho de que tanto la súplica de esta moción como la orden que se dictó sobre la misma no contienen tal lenguaje. Solamente se solicitó—y la· corte sencillamente ordenó—que el informe se radicara en corte. Por tanto no puede haber queja justificada en cuanto a ·la parte dispositiva de la resolución. Nada hay en ella que obligue a la corte a hacer otra cosa que la que ya hemos dicho puede hacer—recibir el informe y, mediante sus pro-

pios procedimientos, desarrollar en un procedimiento *de novo* los hechos, con todas las salvaguardas tradicionales en un pleito. Una vez que los hechos son desarrollados ante la corte de distrito de esta manera, la corte descartará el informe que nunca técnicamente sería admitido en evidencia, y pesará la evidencia realmente admitida y rendirá su propia sentencia independiente sobre los hechos y la ley, sin tomar en cuenta las conclusiones de la Comisión legislativa.([5]) Toda vez que el Procurador General no está en desacuerdo con esta posición, la controversia se reduce al temor de parte del peticionario en cuanto a que la corte de distrito no comprenda y respete las limitaciones necesarias de su propia resolución. Eso sería una asunción gratuita que no estamos dispuestos a hacer. Al contrario, la corte inferior tiene derecho a la presunción de que ella usará el informe, de usarlo, solamente de la manera aquí reseñada.

La resolución de la Cámara revela que le preocupaba la venta del remanente de los activos del Banco Territorial. Si dicha orden de la corte se dictó impróvidamente, era una cuestión a determinarse en apelación, lo que el Tesorero y otras partes interesadas no hicieron. Bajo qué circunstancias y bajo qué clase de procedimiento, si alguno, dicha resolución puede en el futuro ser atacada, es una cuestión que no está ante nos y por tanto no expresamos opinión alguna sobre la misma.

■ Dos cuestiones de procedimiento quedan por resolver. El Procurador General alega que el peticionario, como liquidador estatutario de un banco insolvente, no tiene derecho para levantar la cuestión aquí envuelta. Descansa en el caso de *S. Rosemblum Inc. y Hernández, Admor. Jud.*, 44 D.P.R. 790. Dicho caso se distingue fácilmente. Allí resolvimos que en un procedimiento similar el síndico no tenía derecho de

---

([5]) La fragilidad del argumento en contrario se demuestra aún más convincentemente cuando recordamos que la Cámara de Representantes o toda la Legislatura están en libertad de rechazar el informe de la Comisión.

apelación cuando la resolución de la corte de distrito envolvía solamente una cuestión de preferencia entre acreedores. Pero aquí los intereses del propio liquidador están envueltos directamente, toda vez que la cuestión es la aprobación de sus cuentas finales y si se le releva de ulterior actividad y responsabilidad. Su derecho a terminar su encomienda de liquidador está en disputa. Bajo tales circunstancias no es posible convenir con la contención del Procurador General de que el peticionario no tiene interés en la resolución del 12 de noviembre de 1943.

■ De la misma manera, el peticionario alega que el Procurador General no puede representar válidamente la Comisión legislativa. La Resolución núm. 13 expresamente autoriza el nombramiento de abogado. Hubiera sido más propio si la Comisión hubiera nombrado su propio abogado, particularmente porque tales investigaciones algunas veces se practican contra las actuaciones ejecutivas (*Cf. Sinclair* v. *United States,* supra; *United States* v. *Smith,* 286 U. S. 6). Pero eso es un asunto que descansa en la absoluta discreción de la rama legislativa. Nada hay que impida a la legislatura el utilizar en una situación como ésta los servicios de un abogado que corrientemente trabaja para la rama ejecutiva. En verdad, cuando la legislatura, concluyendo que no se investiga la conducta de funcionarios ejecutivos, lo suficientemente para justificar que se excluya a los funcionarios ejecutivos legales de la misma, opta por funcionar de esta manera, se nos presenta aun más otro ejemplo de la actuación gubernamental conjunta que expone claramente la estructura del gobierno como tupida telaraña.

*El auto de certiorari será anulado.*